In re Mark L. REDBURN d/b/a A–Z Rental and Pamela Jo Redburn f/k/a Pamela Jo Chamberlain, Debtors.

Paul ARMBRUSTMACHER, Judy Brace, Jim Brehm, Larry J. Broughton, Thomas A. Christensen, Elmer Hansen, Richard Heil, Donald L. Henley, Larry & Drew Hoxie, Lindsey A. Hoxie, Joseph & Patricia Kolp, Phil Lange, Scott

McCloud, James Mohre, James E. Patrick, Leon A. Platte, Michael E. Priest, Daniel A. Simon, Christian M. Stapor, Earl Swindlehurst, Sr., Marvin Van Nortwick, and David & Denise Westcott, Plaintiffs,

v.

Mark L. REDBURN, Defendant.

Bankruptcy No. SL–92–86573.
Adversary No. 93–8098.

United States Bankruptcy Court,
W.D. Michigan,
Southern Division.

Dec. 6, 1996.

Michael J. Panek, East Lansing, MI, for Plaintiffs.

Mark L. Redburn, Bath, MI, in pro. per.

## OPINION AND ORDER DISMISSING PLAINTIFFS' COMPLAINT TO DETERMINE DISCHARGEABILITY OF A DEBT

JO ANN C. STEVENSON, Bankruptcy Judge.

### FINDINGS OF FACT AND PROCEDURAL BACKGROUND

We have before us what we hope will be the final resolution of a dispute that has its genesis in the late 1980s. At that time, Defendant Mark A. Redburn was employed by General Motors (hereinafter "GM") in the experimental assembly section of its Lansing Oldsmobile plant. He also owned East Lansing Rental, which he purchased in 1981, and Groesbeck Rental, also located in Lansing, which he organized in 1983. Both businesses were devoted to tool and equipment leasing. In January 1987, he incorporated the businesses under the name R.A.L. Corporation (hereinafter "RAL") pursuant to Michigan law. In 1989, Mr. Redburn became eligible for and accepted an early retirement buyout from GM and thereafter worked exclusively for RAL.

Mr. Redburn's contribution to RAL's capital consisted of the assets of the two rental companies, in exchange for which he received fifty-one percent of the stock of RAL. The

remaining stock was sold to nearly two dozen investors, almost all of whom were Mr. Redburn's co-workers at the Lansing plant.[1] It is undisputed that at the time Mr. Redburn contributed his businesses to RAL, the assets of East Lansing Rental were secured by a lien of approximately $80,000.[2] What is in dispute is whether the Plaintiffs are eligible for relief under Code section 523(a)(2)(A) where they allege that, in an attempt to garner RAL capital investments, Mr. Redburn represented that East Lansing Rental was unencumbered.

Mr. Redburn had planned to use the capital funding to operate RAL's rental business at a single location under the store name A–Z Rentals. He also planned to build a driving range and mini-storage units at the new location. Unfortunately, additional funding in the form of bank financing proved difficult to secure; the new store cost more and took longer to construct than Mr. Redburn had hoped. To make matters worse, the FBI, pursuant to a 1989 investigation, linked a suspected drug dealer to RAL.[3] Mr. Redburn and RAL were eventually cleared of wrongdoing, but not before a notice appeared in a Lansing newspaper announcing a forfeiture sale of RAL's assets. The sale never took place, but word of the newspaper notice spread through the Lansing plant and caused unrest among those employees who were RAL investors.

After several shareholders were unable to secure the return of their capital contributions, twenty-seven RAL investors initiated an action in Ingham County Circuit Court against RAL and several other defendants including Mark Redburn. On October 7, 1991, the parties entered into a stipulated judgment wherein Mr. Redburn admitted responsibility for the plaintiffs' losses, and agreed to pay off the judgment debt in installments over three years with interest at seven percent.[4] Having only paid the judgment creditors approximately $6,000 by January 1992, it became clear that Mr. Redburn could not abide by the stipulated payment terms. Thereafter, in an effort to enforce their judgment, the creditors attempted to attach RAL's assets, whereupon both Mr. Redburn and RAL filed for bankruptcy protection.[5] Twenty-three R.A.L. shareholders then filed an adversary proceeding in this Court against Mark Redburn seeking nondischargeability of the consent judgment pursuant to Code sections 523(a)(2)(A) and (B), and (a)(4).

What followed was a series of delays, both legal and medical, including unsuccessful motions for summary judgment from both sides. These events were well-covered by Judge Gregg in his opinion which marked the end

---

**1.** The other investors included David E. Anderson, who had been manager of Groesbeck Rental since 1983, and Michael F. Lindley, who had been manager of East Lansing Rental since 1985. The name "RAL" was derived from *Red*burn, *A*nderson, and *L*indley.

**2.** Defendant's Exhibit R, at ¶ 1.

**3.** The suspect, James D. Bertrau, later pled guilty to drug and tax-related crimes in federal court. *See U.S. v. Bertrau,* 940 F.2d 663, 1991 WL 138443 (6th Cir.1991).

**4.** The other defendants were dismissed under the stipulation. To the Plaintiffs who remain involved in this case, the following amounts were awarded under the consent judgment: Mr. Brehm, $12,916.72; Mr. Broughton, $25,833.44; Mr. Christensen, $19,375.08; Mr. Lindsey Hoxie, $33,906.34; Mr. Kolp, $16,145.88; Mr. Lange, $6,458.36; Mr. McCloud, $29,062.58; Mr.

Mohre, $6,458.36; Mr. Priest, $29,708.41; Messrs. Simon, Swindlehurst, and Westcott, $6,458.36 each. This Court ruled that the damage amounts established in state court would be given preclusive effect. Judge Gregg touched upon this issue in another case involving these same parties, *In re Redburn,* 193 B.R. 249, 257 (Bkrtcy.W.D.Mich.1996) ("While the ultimate issue of nondischargeability remains undecided in [Mr. Redburn's Chapter 7 case], the amount of the debt was fixed by [the Ingham County consent judgment] and that judgment is binding on this court.") (related citations omitted); *see also Brown v. Sachs (In re Brown),* 56 B.R. 954, 959 (Bkrtcy.E.D.Mich.1986) ("Res judicata bars relitigation of the judgment of the state court as to the amount of the debt, even though the dischargeability of the debt itself can only be decided in the bankruptcy court.").

**5.** Mr. Redburn and his wife Pamela Jo Redburn filed Chapter 7 on December 2, 1992 (# 92–

of Mr. Redburn's foray into Chapter 13.[6] Finally, with Plaintiffs' ranks reduced to twelve, trial was held on October 28 and 29, 1996.

This adversary proceeding to determine dischargeability is a core proceeding pursuant to 28 U.S.C. section 157(b)(2)(I). Accordingly, this Court is authorized to enter final judgment subject to the appeal rights afforded by 28 U.S.C. section 158 as governed by the Fed.R.Bankr.P. 8001, *et seq.*

## THE TRIAL

### A. Preliminary Matters

At the commencement of trial, Plaintiffs' counsel Michael J. Panek, Esq. confirmed that only twelve of the original twenty-three Plaintiffs remained.[7] All appeared for trial and testified except Earl Swindlehurst, Sr., who now resides out of state. As Mr. Panek did not satisfy the Court that Mr. Swindlehurst was unavailable to testify and subject himself to cross examination, the Court ruled Mr. Swindlehurst's affidavit, which was admitted into evidence, would be given little weight.[8] Attorney Panek also concurred that relief was only being sought pursuant to

Code section 523(a)(2)(A);[9] the Plaintiffs made clear they no longer sought relief under sections 523(a)(2)(B)[10] or (a)(4).[11] The consequences of the section 523(a)(2)(B) waiver will soon become evident. Mr. Redburn appeared *in pro per*, his attorney having withdrawn some months prior to trial. Mr. Panek and Mr. Redburn stipulated to the entry into evidence of all proposed exhibits.

### B. Testimony: the Alleged Misrepresentations

The eleven plaintiffs who appeared as well as witness Scott Richards, an RAL investor but not a party in this litigation, all gave similar accounts as to how they came to invest in RAL. All had been long-time employees of GM at the Experimental Auto Assembly Division in Lansing and all had known Mr. Redburn from work. Several Plaintiffs socialized with Mr. Redburn outside of work as well.[12]

■ Necessary to any successful section 523(a)(2)(A) case is proof that the debtor made a "material misrepresentation." *See Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 961 (6th Cir.1993). The misrepresenta-

---

85673), with RAL filing Chapter 11 on November 17, 1992 (# 92–86287).

**6.** *In re Redburn, supra.* Plaintiffs' counsel argued that although Judge Gregg did not rule on whether Mr. Redburn committed fraud concerning these claims, he nevertheless found that the claims were "viable." Tr. at 394. In fact, Judge Gregg found that although Mr. Redburn scheduled the state court judgment debt as "disputed" in his Chapter 13, the amount of that debt was determined in state court and was binding on the bankruptcy court. *In re Redburn, supra,* at 258; *see also supra* note 4. The character of the debt—whether or not it was fraudulently incurred—was not at issue in Mr. Redburn's Chapter 13 case. This is because an otherwise eligible Chapter 13 debtor may discharge a debt adjudged nondischargeable for fraud in a Chapter 7 case. *See* 11 U.S.C. § 1328(a)(2). That Mr. Redburn scheduled the debts owed under the state court judgment in his Chapter 13 and did not formally object to them is immaterial to this proceeding.

**7.** They are identified *supra* note 4.

**8.** *See* Fed.R.Bankr.P. 9017(a) ("[t]he testimony of witnesses shall be taken in open court, unless otherwise provided by an Act of Congress or by these rules. . . ."); *see also FCC National Bank v. Roberts (In re Roberts),* 193 B.R. 828, 831

(Bkrtcy.W.D.Mich.1996) (claimant must submit testimony in § 523(a)(2)(A) case).

**9.** 11 U.S.C. § 523(a)(2)(A).

**10.** 11 U.S.C. § 523(a)(2)(B); *see* Trial transcript (hereinafter "Tr.") at 12.

**11.** 11 U.S.C. § 523(a)(4); *see* Court's Orders of November 25, 1994, and May 1, 1995.

**12.** Mr. Broughton had known Mr. Redburn through work since Mr. Redburn began working at GM (Tr. at 16–17); Mr. Brehm had been good friends with Mr. Redburn in and out of work since Mr. Redburn began at GM (Tr. at 96); Mr. Westcott had known Mr. Redburn from work since 1981 and also knew him socially (Tr. at 118–19); Mr. Hoxie had known Mr. Redburn for many years at work and socially outside of work. (Tr. at 145–46); Mr. Lange had known Mr. Redburn for many years at work. (Tr. at 171); Witness Mr. Richards had known Mr. Redburn at work since 1980. (Tr. at 195); Mr. Simon had known Mr. Redburn through work and socially since 1983 (Tr. at 212); Mr. Kolp had known Mr. Redburn from GM for many years (Tr. at 255); Mr. Mohre had known Mr. Redburn at work from the time Mr. Redburn came to GM, but not socially (Tr. at 282–83); Mr. McCloud had known Mr. Redburn at GM since 1978 and had socialized with him outside of work (Tr. at 304–

tions that Mr. Redburn made, according to the Plaintiffs, may be divided into two categories: 1) that, prior to Plaintiffs' investing in RAL, Mr. Redburn stated that he owned the rental companies he was contributing to capital "free and clear," when in fact he did not, or that, alternatively, he told Plaintiffs that he "owned" the rental companies, which they understood to mean "owned free and clear"; and, 2) that he knowingly produced false RAL stock reports which several Plaintiffs reviewed before investing.[13]

The eleven Plaintiffs who appeared and Mr. Richards all testified that prior to investing in RAL, Mr. Redburn stated that he owned Groesbeck Rental and East Lansing

Rental (hereinafter, "the rental companies"), that he would contribute the assets of those businesses to RAL, and that in return he would receive the majority of the RAL stock. And, although some seemed to remember events more clearly than others, each testified that Mr. Redburn said either that he owned the assets of the rental companies "free and clear" or that when Mr. Redburn said that he "owned" assets, they understood him to mean that he owned the assets outright, free and clear of encumbrances.[14]

## C. The Ingham County Consent Judgment

In support of their claims, Plaintiffs cited the October 1991 consent judgment which

---

05); Mr. Priest had known Mr. Redburn at GM since Mr. Redburn came to work there (Tr. at 337); Mr. Christensen had known Mr. Redburn at GM since Mr. Redburn came to work there (Tr. at 367).

Upon Defendant's motion to sequester the witnesses, the Court instructed each witness to wait outside the courtroom until it came his turn to testify. After testifying, each witness was allowed to remain in the courtroom. At trial the Court cautioned each witness against discussing his testimony with all those who had yet to testify.

**13.** Many of the Plaintiffs also made mention of their pre-investment reliance upon two "Private Placement Memoranda," which were in the nature of written prospectuses. See, e.g. Tr. at 131 (testimony of Mr. Westcott); the Memoranda were admitted into evidence as Plaintiffs' Exhibits numbers 1 and 2. The first Memorandum is dated March 1, 1987 and states that RAL "as of September 30, 1987, has assets of approximately $575,000.00.... made up of cash, land, buildings, and rental equipment." Plaintiffs' Exhibit # 2 at 8. Later in that Memorandum it is stated that "Mr. Redburn is currently the owner of 2 Rental Stores ... East Lansing Rental ... which he has owned for four (4) years and Groesbeck Rental ... which he has owned for three (3) years." Plaintiffs' Exhibit # 1 at 15. The second Memorandum, dated December 7, 1987, states that RAL "currently owns (2) two rental stores; East Lansing Rental ... and Groesbeck Rental ..." Id. at 9. These will be considered as additional statements by Mr. Redburn that he "owned" the rental companies.

**14.** In order of appearance, the testimony concerning what Mr. Redburn said to Plaintiffs before they invested was: —Mr. Broughton: "I asked [Mr. Redburn] if there was any debt or anything like that [on the rental companies]. He said no." (Tr. at 33); —Mr. Brehm: "[Mr. Red-

burn said] that he was bringing his two current businesses which he owned free and clear into the deal." (Tr. at 97, 109–10); —Mr. Westcott: "[Mr. Redburn said] that he owned [the rental companies] free and clear. That was the major reason I invested." (Tr. at 121). When asked on direct examination whether he relied more on the prospectus or on Mr. Redburn's statements, Mr. Westcott responded that he relied more on Mr. Redburn's "character." (Tr. at 127). On cross examination:

MR. REDBURN: You said you received a prospectus and that was your main reliance upon the investment?
MR. WESTCOTT: I would say so, yes. (Tr. at 131);

—Mr. Hoxie: "[Mr. Redburn said that] he owned [the rental companies] free and clear and [that] he was going to put them in [RAL]." (Tr. at 152) (upon examination by the Court, Mr. Hoxie said that Mr. Redburn's words were that he did not "owe on" the rental companies. (Tr. at 168); —Mr. Lange: "Mr. Redburn informed me at the time that there was no debt, that's why none needed to be disclosed." (Tr. at 172); —Mr. Richards: "[Mr. Redburn] told me there wasn't any debt [on the rental companies]." (Tr. at 198); —Mr. Simon: "I understood that [Mr. Redburn] fully owned [the rental companies].... [I] really don't recall how I came to the understanding, whether it was my assumptions or if he did tell me that." (Tr. at 216);
—Mr. Kolp: (on cross examination):
MR. REDBURN: Did I ever specifically tell you that I owned the [rental businesses free and clear]?
MR. KOLP: I don't recall if you did or not. (Tr. at 272);
—Mr. Mohre: (on cross examination):
MR. REDBURN: Did I ever tell you that I owned [the rental companies] free and clear?
MR. MOHRE: You indicated that those were owned by you, and you never mentioned any debt.

settled the RAL investors' litigation against Mr. Redburn, RAL, and the other defendants in Ingham County Court. They particularly rely on the following language from the judgment:

> By way of example and not by way of limitation, the parties stipulate and agree that Defendant Mark L. Redburn misrepresented certain facts to the plaintiffs to induce the plaintiffs to invest monies in RAL, to wit: Mark L. Redburn represented that two businesses owned by him (Groesbeck Rental and East Lansing Rental) were owned free and clear and that he would contribute said businesses to RAL when, in fact, said businesses owed outstanding bills in the amount of approximately $80,000.00.[15]

Plaintiffs do not contend that Mr. Redburn failed to contribute the assets of the rental companies to RAL. Instead, they claim that the rental companies were subject to an $80,000 lien of which they were either unapprised, or which Mr. Redburn claimed did not exist.

> MR. REDBURN: But I didn't specifically say they were free and clear.
> MR. MOHRE: I don't know that you actually said those words, but it was clear to me that you owned them without any debt. (Tr. at 294);
> —*Mr. McCloud:* (on cross examination):
> MR. REDBURN: Did I tell you that I owned all the assets of RAL free and clear?
> MR. McCLOUD: Yes. You own them. You own them free and clear. (Tr. at 326); and later:
> THE COURT: Did [Mr. Redburn] ever say to you, 'I own these assets or any of these assets free and clear'? Not what you understood, what Mr. Redburn said.
> MR. McCLOUD: No, [he] did not. [He] never said that. (Tr. at 327);
> —*Mr. Priest:* "I asked [Mr. Redburn] about [the rental companies], if he had any debt.... At the time before my first purchase, he said he didn't...." (Tr. at 356); —*Mr. Christensen:* "I was—at the time [I was considering whether to invest]—I was led to believe that [Mr. Redburn] owned [the rental companies] free and clear. I wasn't outright told that they were owned free and clear, but it was—that was the impression that I was given [by him]." (Tr. at 369).

15. Plaintiffs' Exhibit # 7 at ¶ 4. The more unusual aspect of this judgment is contained in its first paragraph, which reads, in relevant part:

## DISCUSSION

### A. *The Law: § 523(a)(2)(A)*

■ The Supreme Court has instructed that only "honest but unfortunate" debtors should be afforded a "fresh start" in bankruptcy. *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). For its part, Congress has tempered the general principle of debt discharge by enacting various exceptions, including one for debts obtained by "false pretenses, false representation, or actual fraud...."[16] The fraud debt exception, as with the others enumerated in section 523, is to be strictly construed in favor of the debtor. *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *Manufacturer's Hanover Trust Co. v. Ward (In re Ward)*, 857 F.2d 1082, 1083 (6th Cir.1988). The claimant bears the burden of persuasion, and must prove every element of its case by a "preponderance of the evidence." *Grogan, supra,* 498 U.S. at 291, 111 S.Ct. at 661.

Plaintiffs seek a judgment of nondischargeability for the debts Mr. Redburn

> The parties stipulate and agree that the allegations of the Complaint as against Defendants Mark L. Redburn and RAL are admitted, *for purposes of this litigation only and not for any other purpose*, ...

*Id.* at ¶ 1 (italics added). Mr. Panek claimed that the Plaintiffs, by including that provision, intended to leave themselves free to proceed in the future against Mr. Redburn in other courts. Tr. at 392–93. Mr. Redburn denied committing the acts mentioned in paragraph 4, and explained that he stipulated to the limiting language so that accusations he "didn't agree with" would not be used against him in later proceedings. Tr. at 398.

We do not address the public policy of including such language in a consent judgment, nor do we rule on what the parties intended by including it in their stipulation. The fact is, the Court has already ruled that the consent judgment has no collateral estoppel effect in this proceeding. *Armbrustmacher, et al. v. Redburn (In re Redburn)*, Adv. No. 93–8098 (Bkrtcy.W.D.Mich. Oct. 5, 1993) (Order Denying Motion for Summary Disposition). However, as Mr. Redburn did not object, the state court judgment was entered into evidence. In reaching its decision the Court has considered the entire content of the prior judgment, as well as the parties' testimony respecting the judgment and the admissions contained therein.

16. *See* 11 U.S.C. § 523(a)(2)(A).

owes pursuant to the state court judgment. They proceed under section 523(a)(2)(A) which reads, in pertinent part—

(a) A discharge under section 727 ... does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition....[17]

The Court must also consider subsection (B) of section 523(a)(2), which excepts from discharge debts obtained by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive....[18]

According to *In re McLaren, supra*, one seeking relief under section 523(a)(2)(A)—

must prove that the debtor obtained money through a material misrepresentation that at the time the debtor knew was false or made with gross recklessness as to its truth. The creditor must also prove the debtor's intent to deceive. Moreover, the creditor must prove that it reasonably relied on the false representation and that its reliance was the proximate cause of loss.[19]

These elements were modified in one particular by *Field v. Mans*, —— U.S. ——, —— —— ——, 116 S.Ct. 437, 445–46, 133 L.Ed.2d 351 (1995), which held that the proper measure for reliance is not the objective or "reasonable" standard, but the less demanding "justifiable" reliance standard.

### B. Mutual Exclusivity: §§ 523(a)(2)(A), (B)

The key language for the purposes of this case is the last phrase of section 523(a)(2)(A), "other than a statement respecting the debtor's or an insider's financial condition." According to the wording of section 523(a)(2), its legislative history, and the caselaw, subsections (A) and (B) are mutually exclusive, in that statements regarding the debtor's or an insider's financial condition are expressly excluded from the reach of subsection (A) and are only actionable under subsection (B). *Eugene Parks Law Corp. Defined Benefit Pension Plan v. Kirsh (In re Kirsh)*, 973 F.2d 1454, 1457 (9th Cir.1992); *Thul v. Ophaug (In re Ophaug)*, 827 F.2d 340, 342–43 (8th Cir.1987); *Zimmerman v. Soderlund (In re Soderlund)*, 197 B.R. 742, 744 (Bkrtcy.D.Mass.1996) ("The statutory dichotomy is absolute. The challenged action either is or is not a statement regarding financial condition...."); 124 Cong.Rec. H11095–96 (daily ed. Sept. 28, 1978), S17412 (daily ed. Oct. 6, 1978) ("Subparagraph (A) is mutually exclusive from subparagraph (B)").

As a result, a creditor challenging a debt that was incurred as a result of a statement respecting the debtor's or an insider's financial condition may not proceed under subsection (A), but must instead satisfy the requirements of subsection (B), including the requirement that the statement be in writing. An oral misrepresentation of financial condition is not actionable. *Soderlund, supra* at 744–45.

### C. Statutory Interpretation: "Statement respecting ... financial condition"

The Code does not define "statement" or further assist us in defining the phrase we are called upon to interpret. Courts that have taken up the task have settled upon two views which may be termed the "limited" and the "expansive" views. Neither interpreta-

---

**17.** 11 U.S.C. § 523(a)(2)(A).

**18.** 11 U.S.C. § 523(a)(2)(B).

**19.** *In re McLaren, supra* at 961.

tion is binding upon this Court.[20] Whether we adopt a limited or an expansive view, or some variation thereof, is a critical issue in this case because the Plaintiffs, having waived their subsection (B) claims, elected to proceed only under subsection (A).[21] The Plaintiffs' claims must be dismissed if the Court finds that the statements Mr. Redburn allegedly made were "statements respecting the debtor's or an insider's financial condition," since debts traceable to such statements are not actionable under subsection (A).

### 1. The "Limited" View.

The proponents of a limited reading of the phrase "statements respecting ... financial condition" have offered two main rationales for their rulings. First, they reason that the word "statement" in ordinary financial usage denotes a balance sheet of some kind, an accounting of assets and liabilities. *See, e.g. In re Kirsh, supra,* at 1457; *Gehlhausen v. Olinger (In re Olinger),* 160 B.R. 1004, 1009 (Bkrtcy.S.D.Ind.1994); *Bal–Ross Grocers, Inc. v. Sansoucy (In re Sansoucy),* 136 B.R. 20, 22 (Bkrtcy.D.N.H.1992); *Jokay Co. v. Mercado (In re Mercado),* 144 B.R. 879, 884 (Bkrtcy.C.D.Cal.1992) ("The ordinary usage of 'statement' in connection with 'financial condition' denotes either a representation of a person's overall 'net worth' or a person's overall ability to generate income.")

Secondly, some of these courts, departing from plain meaning, have found that good policy dictates a limited reading of "statement." The main concern expressed is that egregious frauds—oral misrepresentations of a debtor's financial condition—will go unaddressed under a more expansive reading. For example, a Massachusetts bankruptcy court recently noted that such frauds are perpetrated most often upon "amateur lenders—friends, family, and the like—rather than banks and other institutional lenders, which generally require financial information ... in writing." *Soderlund, supra* at 745; *accord, Olinger, supra* at 1011 ("[an expansive] construction would result in many plaintiffs being left without a cause of action if they did not have the foresight to require a written statement in situations that normally do not require one.")

### 2. The "Expansive" View.

Courts giving an expansive reading to the phrase "statements respecting ... financial condition" have also relied upon plain meaning. However, unlike the limited view courts, they have given the word "statement" to mean an utterance of some kind, a denotation not limited to the word's financial context. *See, e.g. Chrysler First Financial Services Corp. v. Rhodes (In re Rhodes),* 93 B.R. 622, 624 (Bkrtcy.S.D.Ill.1988) ("Plaintiff ... cannot credibly argue that the oral statements or nondisclosures attributed to debtors falsely depicting the number of their creditors and the amounts of their debts are not 'statement[s] respecting the debtor[s'] ... financial condition'.").

In the leading case in the "expansive" line, *Engler v. Van Steinburg (In re Van Steinburg),* 744 F.2d 1060 (4th Cir.1984), the plaintiff extended a loan to the debtor/defendant secured by a lien on the debtor's livestock. During negotiations the debtor had assured the lender a first-priority status at a time when the debtor knew that superior liens on the livestock were already in place. In holding that the plaintiff's claim was excluded from the reach of section 523(a)(2)(A), the court said:

> [c]oncededly, a statement that one's assets are not encumbered is not a formal finan-

---

**20.** The Sixth Circuit touched upon the issue, in *dicta,* in *Investors Credit Corporation v. Batie (In re Batie),* 995 F.2d 85 (6th Cir.1993), a § 523(a)(2)(B) case. There, a seller of an airplane required the buyer (later, the debtor) to show that he and his company each had a net worth of $2 million. The court found that the debtor had made "statement[s] in writing re-specting the debtor's or an insider's financial condition' under section 523(a)(2)(B) because [the debtor] submitted written statements at the closing which plainly showed his net worth." *In re Batie, supra* at 89–90.

**21.** Tr. at 12, 390.

cial statement in the ordinary usage of that phrase. But Congress did not speak in terms of financial statements. Instead it referred to a much broader class of statements—those 'respecting the debtor's [or an insider's] financial condition'. A debtor's assertion that he owns certain property free and clear of other liens is a statement respecting his financial condition. Indeed, whether his assets are encumbered may be the most significant information about his financial condition.[22]

Many courts have followed *In re Steinburg's* expansive reading of "statement." *See, e.g. Beneficial National Bank v. Priestley (In re Priestley)*, 201 B.R. 875, 883 (Bkrtcy.D.Del.1996) ("the majority of the reported decisions on the issue articulate a broader definition of 'financial condition'."); *White v. Grisham (In re Grisham)*, 177 B.R. 306, 309 (Bkrtcy.W.D.Mo.1995); *Chemical Bank v. Sigrist (In re Sigrist)*, 163 B.R. 940, 947 (Bkrtcy.W.D.N.Y.1994); *Farmers National Bank of Canfield v. Kolbfleisch (In re Kolbfleisch)*, 97 B.R. 351, 353 (Bkrtcy. N.D.Ohio 1989).

### D. Resolution: Modified "Expansive" View

■ We begin, as we must, with the statutory language. The plain meaning of statutory language controls "except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters'."

*U.S. v. Ron Pair Enterprises*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (citation omitted). The problem here, as outlined *supra*, is that courts have offered two interpretations of the phrase "statement respecting ... financial condition," both grounded in plain meaning, and plausibly so.

In the Court's view, neither reading will produce results "demonstrably at odds" with Congressional intent. *Contra, In re Sansoucy, supra* at 23 (expansive reading compels "odd result"). Under a limited reading, subsection (A) will apply to more creditor/plaintiffs, as fewer claims will fall under subsection (A)'s statement of financial condition exclusion. On the other hand, under an expansive reading, more claims will be actionable under subsection (B). And while some frauds might go unredressed under an expansive view—those involving oral misstatements of financial condition—bankruptcy courts will be called upon less often to preside over "swearing matches," where parties' assertions are contradictory but no written evidence is presented.

The legislative history is silent as to the preferred reading, but it does reveal that creditor abuse of the Bankruptcy Act fraud exception was part of what prompted Congress in 1978 to enact separate subsections (A) and (B), with separate statutory requirements. The substance of the two subsections was included in the same section of the Bankruptcy Act.[23] However, in 1978 Congress included a "reasonable reliance" re-

---

**22.** *In re Van Steinburg, supra* at 1060–61.

**23.** Bankruptcy Act section 17a(2), the former 11 U.S.C. section 35(a)(2), excepted from discharge those debts—

> (2) ... for obtaining money or property by false pretenses or false representations, or for obtaining money or property on credit or obtaining an extension or renewal of credit in reliance upon a materially false statement in writing respecting [the debtor's] financial condition made or published or caused to be made or published in any manner whatsoever with intent to deceive....

Under the 1978 Code, false statements respecting a debtor's or an insider's financial condition were split off from other frauds, the former covered under section 523(a)(2)(B), the latter, with

the addition of "actual fraud" debts, under subsection (A).

Whereas debts incurred through fraud had been excepted from discharge as early as 1867, false financial statements were not included under section 17a(2) until 1960. Prior to that time, proof that a debt was incurred due to a "materially false statement in writing respecting [the debtor's] financial condition" was grounds for an objection to discharge under Act section 14c(3), the former 11 U.S.C. section 32(c)(3). By 1960, Congress had come to believe that the outright denial of an individual debtor's discharge was an overly severe penalty in this context, and that unscrupulous creditors had been abusing section 14c(3) by intimidating individual debtors into reaffirming debts under the threat of a denial of discharge. As a remedy, Congress removed from section 14c(3) debts that were based on false

quirement in the new subsection (B), but did not mention reliance in subsection (A).[24] The legislative history suggests that the reliance requirement was directed at cases where a lender requires a borrower to provide a statement of its financial condition as part of the loan application process. Any written "statement" the borrower gives is actionable only under subsection (B), where the lender is charged with proving reasonable reliance along with the other enumerated elements. However, Congress' expressed intent in the reliance area does not settle the issue at bar. Nowhere in the legislative history does Congress define the word "statement" or the phrase at issue. In short, we agree with Bankruptcy Judge Hillman who found the legislative history neither helpful nor persuasive in this area. *See In re Soderlund, supra* at 745.

■ Upon consideration of the statutory language, the legislative history, the applicable caselaw, and the equities involved, the Court adopts an expansive view, with modification. Congress could have elected to use the more precise term "financial statement" but did not. Instead it used the word "statement" and, later in the same sentence, limit-

ed its meaning by adding, "respecting the debtor's or an insider's financial condition." Thus, the only "statements" which fall within subsection (A)'s exception—and are therefore actionable only under subsection (B), and only then if they are in writing—are those "respecting the debtor's or an insider's financial condition." Of course, oral statements regarding matters other than the debtor's or an insider's financial condition and which constitute false pretenses, false representation, or actual fraud remain actionable under section 523(a)(2)(A). In our view, the court's first job is to identify whether the debtor made a "statement," that is, "an allegation [or a] declaration of matters of fact."[25] Next, if one is found, the court must decide whether the statement falls within the limiting language, "respecting the debtor's or an insider's financial condition."

■ Some of the Plaintiffs contend that Mr. Redburn said that he "owned" the assets of the rental companies without saying that they were subject to liens, while others allege that Mr. Redburn said that he owned those assets "free and clear" of liens. For purposes of this opinion only, we will assume that Mr. Redburn made those statements, in

---

written statements respecting an individual debtor's financial condition, and amended section 17a(2) to include those debts. *See* S.R. No. 1688, 86th Cong., 2d Sess. (1960); 11 U.S.C. § 35(a)(2) (repealed 1978). A debtor remained subject to a denial of discharge under section 14c(3) if the debtor made such a statement "while engaged in business as a sole proprietor, partnership, or as an executive of a corporation." 11 U.S.C. § 32(c)(3) (repealed 1978).

24. As explained by the Supreme Court in *Field v. Mans, supra,* by 1978 Congress had become concerned with a routine practice among some consumer finance companies under Act section 17a(2) whereby lenders encouraged borrowers to submit false or incomplete loan applications for the purpose of insulating the lender in the event of applicant bankruptcy. *Field, supra* at ——, 116 S.Ct. at 447. The court cited the House Report on the 1978 Act:

It is a frequent practice for consumer finance companies to take a list from each loan applicant of other loans or debts that the applicant [has] outstanding. While the ... companies use these statements in evaluating the credit risk, very often the statements are used as a

basis for a false financial statement exception to discharge. The forms that the applicant fills out often have too little space for a complete list of debts. Frequently, a loan applicant is instructed by a loan officer to list only a few or only the most important of his debts. Then, at the bottom of the form, the phrase 'I have no other debts' is either printed on the form, or the applicant is instructed to write the phrase in his own handwriting.

*Id.* at —— n. 13, 116 S.Ct. at 447 n. 13 (*citing* U.S.Code Cong. & Admin.News 1978 at 5787, 6091 (1977)). The finance companies normally had at hand additional ways of determining the financial condition of their loan applicants, notably, information from credit reporting bureaus. In such a case under the new section 523(a)(2)(B), a finance company that claims it relied solely upon a debtor's written loan application in extending a loan will have failed to show reasonable reliance. *Field* held that the less rigorous justifiable reliance standard—the accepted measure under the common law of fraud—applies in subsection (A) cases.

25. BLACK'S LAW DICTIONARY 1408 (6th ed. 1991) ("statement").

some instances simply saying that he "owned" the assets and in others saying that he owned the assets "free and clear."[26] Both statements are ones "respecting the debtor's or an insider's financial condition," because the presence *vel non* of liens on corporate property—or on property owned by an investor who plans to contribute that property to a corporation—is a piece of information a potential lender or investor would generally consider before investing. *See In re Van Steinburg, supra* at 1060–61; *Hudson Valley Water Resources, Inc. v. Boice (In re Boice),* 149 B.R. 40, 46 (Bkrtcy.S.D.N.Y. 1992); *Butler v. Roberts (In re Roberts),* 54 B.R. 765, 770 (Bkrtcy.D.N.D.1985). And whether the statements concerned Mr. Redburn's or RAL's financial condition is of no consequence, since RAL qualifies as an "insider" under the Code.[27]

■ Indeed, a statement regarding encumbrances may go to the very heart of a corporation's financial condition, especially where the issue is whether or not to invest in the corporation. In this case, it is unclear whether the $80,000 in liens on the rental companies was a significant amount when measured against RAL's overall financial picture. It is clear, however, that the statements concerning the rental companies represented at least a part of that picture to the Plaintiffs as potential RAL investors.[28]

Further support for the Court's decision is provided by the reasoning of *Norcross v. Ransford (In re Ransford),* 202 B.R. 1, 4 (Bkrtcy.D.Mass.1996), wherein the court attempted to reconcile the expansive and limited view cases from the District of Massachu-setts. *Ransford* held that the court should not only focus upon the nature of the statement, but also upon the intended purpose of the statement.[29] The *Ransford* court offered the example of *In re Soderlund, supra,* a limited view case, and reasoned that the *Soderlund* debtor's alleged misrepresentations were, in substance, promises concerning his future behavior, not statements respecting his then-current financial condition. *Ransford, supra* at 5. In contrast, in *Connecticut Nat'l Bank v. Panaia (In re Panaia),* 61 B.R. 959 (Bkrtcy.D.Mass.1986), an expansive view case, at issue was the debtor's oral misstatement to a bank concerning the net worth of collateral for a loan. According to *Ransford,* as the debtor's purpose was to overstate his financial condition in order to obtain a loan, *Panaia* properly held that no cause of action could be had under subsection (A).

The *Ransford* method of interpretation is persuasive, and when applied in this case produces the result announced above. Not only were Mr. Redburn's alleged statements in the nature of ones respecting financial condition, but the net worth of the rental companies affected RAL's overall financial picture which, in turn, affected the soundness of RAL as an investment opportunity. Thus, as "statements respecting [RAL's] financial condition," the claims which concern these statements are excluded from the reach of subsection (A). Under the statute, in order for the statements to have been actionable, Plaintiffs would have had to plead and prove the elements of subsection (B), including the "in writing" requirement. This they failed to

---

26. We consider the alleged statements together, since a deliberate nondisclosure of a material fact—whether or not the assets were encumbered in this case—is just as culpable as an intentional false affirmation. *McHenry v. Ward (In re Ward),* 115 B.R. 532, 539 (W.D.Mich.1990). *Mursau Corp. v. Florida Penn Oil & Gas, Inc.,* 638 F.Supp. 259 (W.D.Pa.1986); *Marian Bank v. International Harvester Credit Corp.,* 550 F.Supp. 456 (E.D.Pa.1982), *aff'd. mem.,* 725 F.2d 668 (3rd Cir.1983).

27. Pursuant to 11 U.S.C. § 101(31), "insider" includes—

(A) if the debtor is an individual—

*   *   *   *   *   *

(iv) corporation of which the debtor is a director, officer, or person in control[.]

As Mr. Redburn was president of RAL, RAL qualifies as an "insider."

28. *See, e.g.,* Tr. at 33 (testimony of Mr. Broughton).

29. Bankruptcy Judge Boroff based his approach on language from *In re Mercado, supra,* at 884.

do.[30]

Plaintiffs also rely upon statements in the quarterly stockholder reports which Mr. Redburn prepared. Mr. Redburn denied the reports were false, although several Plaintiffs testified that he admitted falsifying them.[31] At the outset, most of the Plaintiffs—all but five—stated that they never saw a stock report before they invested in RAL.[32] The claims of those Plaintiffs respecting the stock reports must fail, since, in order to show reliance, any misrepresentation must have been made at or before the time the debt was incurred. *See McLaren, supra* at 961. As for the other Plaintiffs, the Court must again decide whether statements contained in the stock reports were ones "respecting the debtor's or an insider's financial condition." We find that they were such statements, because the stock reports were intended to convey material financial information about RAL, an "insider" of debtor Redburn, to current and potential investors of RAL. As with the statements regarding the encumbrances upon the rental companies, these reports contained crucial information on RAL's financial condition, to wit, a listing of the book value of RAL's assets.[33] As such, the statements therein would be actionable, if at all, only under subsection (B).

### CONCLUSION

The Court is disturbed by what has transpired in this case, both at trial and beforehand. Many of the Plaintiffs related suspiciously similar testimony—perhaps understandable due to the passage of many years and their admission that they discussed this case an average of several times weekly during those years—as to how investments in RAL were solicited by Mr. Redburn. Mr. Redburn flatly denied making the statements he was accused of making, and denied doing anything other than attempting to organize and operate a successful business. As in many cases, the Court cannot say that the Defendant did nothing wrong in his RAL dealings. It is clear, however, that the fraud which was alleged by the Plaintiffs to have been committed by Mr. Redburn was not actionable under section 523(a)(2)(A). Therefore, the Plaintiffs' claims must be DISMISSED.

---

**30.** In fact, six of the Plaintiffs, upon cross-examination, admitted that the statements at issue related to RAL's financial condition. Plaintiffs' counsel raised no objection. *See* Tr. at 132–33 (Mr. Westcott); *Id.* at 158–59 (Mr. Hoxie); *Id.* at 182–83 (Mr. Lange); *Id.* at 224 (Mr. Simon); *Id.* at 294 (Mr. Mohre); *Id.* at 325–26 (Mr. McCloud).

**31.** *See, e.g.* Tr. at 45 (testimony of Mr. Broughton). Plaintiffs' counsel never called Mr. Redburn to the stand, but because Mr. Redburn appeared *in pro per,* and was prone to making statements which might be considered testimony rather than argument, the Court swore him as a witness and explained that his statements would be considered testimony. Plaintiffs' counsel did not object to that procedure. Tr. at 78–79. Regarding the stock reports, Mr. Redburn claimed that they were not false but that he stated therein the value of RAL's stock to the best of his ability. Tr. at 397. He also challenged the sufficiency of Plaintiffs' proof on the falsity of the reports. *Id.*

**32.** These Plaintiffs testified that they did not rely upon an RAL stock report before investing: 1) Mr. Broughton (Tr. at 71); 2) Mr. Westcott (Tr. at 127); 3) Mr. Hoxie (Tr. at 159); 4) Mr. Lange (Tr. at 185); 5) Mr. Simon (Tr. at 225); 6) Mr. Mohre (Tr. at 289); 7) Mr. McCloud (Tr. at 306).

**33.** *See, e.g.* Plaintiffs' Exhibit # 12.