In re Todd BOOHER, Debtor.

Telmark, LLC, Plaintiff,

v.

Todd Booher, Defendant.

Todd Booher, Movant,

v.

Telmark, LLC, Respondent.

Bankruptcy No. 00–25036–MBM.
Adversary No. 01–2056–MBM.
Motion No. 01–7313M.

United States Bankruptcy Court,
W.D. Pennsylvania.

Oct. 17, 2002.

Owen W. Katz, Pittsburgh, PA, for Telmark, LLC.

Olivia J. Lorenzo, Pittsburgh, PA, for Todd Booher.

## MEMORANDUM OPINION

M. BRUCE McCULLOUGH, Bankruptcy Judge.

Before the Court is the adversary complaint of Telmark, LLC (hereafter "Telmark") (Adv. No. 01–2056–MBM), wherein Telmark seeks a determination that its claim against Todd Booher, the above-captioned debtor (hereafter "the Debtor"), is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6). Also before the Court is the Debtor's objection to Telmark's claim (Mot. No. 01–7313M). The Debtor takes the position that, if his objection to Telmark's claim is sustained and such claim is disallowed in its entirety, then Telmark's nondischargeability adversary action becomes moot. For the reasons set forth below, the Court holds that (a) Telmark's claim cannot be excepted from the Debtor's Chapter 7 discharge under either 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), or 523(a)(6), (b) judgment in the instant adversary proceeding is thus entered in favor of the Debtor, and (c) Telmark's claim is accordingly discharged in its entirety. Because Telmark's claim is discharged in its entirety, and since the instant bankruptcy case is now a no-asset Chapter 7 case after its prior conversions from Chapters 11 and 12, the Court has no need to liquidate such claim. Therefore, the Debtor's objection to Telmark's claim shall be dismissed as moot.

### STATEMENT OF FACTS

On April 6, 1999, a lease agreement was executed between the Debtor, as lessee, and Telmark, as lessor, for a lease of two Manure Tank Spreaders and an Excavator (hereafter "the April 6, 1999 Lease"). On April 6, 1999, sixteen (16) additional leases for various types of farm equipment were also outstanding between the Debtor, as lessee, and Telmark, as lessor. The April

6, 1999 Lease is the final lease that the parties entered into amongst themselves. The Debtor testified at the September 18, 2002 trial before this Court that all of the farm equipment that he had leased from Telmark was first purchased by the Debtor from another entity, then sold by the Debtor to Telmark, and then subsequently leased back by the Debtor from Telmark.

On April 9, 1999, or three (3) days subsequent to the execution of the April 6, 1999 Lease, and apparently because Telmark had concerns regarding the continued viability of the Debtor's farming operations, the parties executed a security agreement and corresponding UCC financing statement (hereafter "the UCC Financing Statement"). Such security agreement provides, *inter alia*, that:

1. Telmark has a security interest in all of the equipment (a) that was under lease between the parties as of April 9, 1999, and (b) which might become the subject of a future lease between the parties, and

2. Such security interests of Telmark will act as security for the Debtor's performance on each and every lease that existed as of April 9, 1999, or which might ultimately be entered into, between the parties—put differently, all of the equipment subject to Telmark's security interest cross-collateralizes each of the leases that existed as of April 9, 1999, or that might exist in the future between the parties.

Telmark's security interest in the aforesaid equipment, of course, could not, and thus did not, take effect with respect to a particular piece of equipment until the Debtor acquired title to such equipment, which acquisition, if it ever occurred, occurred upon termination of a particular lease and payment by the Debtor of the corresponding payoff figure. Because of the cross-collateralization feature of the April 9, 1999 security agreement, both parties, and thus the Court hereafter likewise will, refer to such security agreement as "the Cross–Collateralization Agreement."

Attached as Schedule A to the UCC Financing Statement (hereafter "Schedule A"), which financing statement was executed simultaneously with the Cross–Collateralization Agreement, is a list of equipment, in which equipment, by virtue of the Cross–Collateralization Agreement, Telmark proposed to take a security interest upon the Debtor's ultimate acquisition of title to the same. Because Telmark proposed to ultimately take a security interest in each piece of equipment listed in Schedule A, and since the Debtor executed the UCC Financing Statement to which Schedule A is attached, Telmark argues that the Debtor necessarily represented to Telmark that, on April 9, 1999, the Debtor actually still possessed each such piece of equipment.

The Debtor concedes that he actually disposed of three of the pieces of equipment listed on Schedule A (hereafter "the 3 Pieces of Equipment"), and that he disposed of two of them prior to April 9, 1999. In particular, the Debtor concedes, and has also entered into a stipulation with Telmark to the effect, that (a) he disposed of a Kverneland Bale Wrapper (hereafter "the Bale Wrapper") in or about April 1995, for which disposition he received $10,000, (b) he disposed of a J.D. 5440 Forage Chopper (hereafter "the Forage Chopper") in or about April 1997, for which disposition he received $24,000, (c) he disposed of a White Model # 5100 No Till Corn Planter (hereafter "the Corn Planter") at some point between April 9, 1999, and May 5, 1999, for which disposition he received $1,500, and (d) each such disposition preceded his acquisition of title to such equipment. Telmark has entered

into a stipulation with the Debtor that the Debtor actually disposed of the Corn Planter between April 9, 1999, and May 5, 1999; no additional evidence was presented by either party as to when the Debtor actually disposed of the Corn Planter. The Debtor also alleges, Telmark fails to dispute, and thus the Court shall find, that the Debtor only received $1,500 in return for his disposition of the Corn Planter because he severely damaged the frame to such piece of equipment by accidentally running the same into a telephone pole. The parties agree that, despite the Debtor's disposal of the 3 Pieces of Equipment, the Debtor (a) continued to make the lease payments which corresponded to the lease that pertained to each disposed piece of equipment, (b) ultimately made all payments due under each such lease, and (c) ultimately paid the payoff figure at the end of the lease term for each disposed piece of equipment.

Telmark asserts that the Debtor never informed Telmark that he had disposed of the 3 Pieces of Equipment, and that Telmark did not learn of any of such disposals until after the Debtor's June 30, 2000 commencement of the instant bankruptcy case. The Debtor concedes that he did not inform Telmark of his disposal of the Corn Planter until the date upon which Telmark sought relief from the automatic stay to take possession of such equipment, which date obviously occurred subsequent to the commencement of the instant bankruptcy case. However, the Debtor maintains that he told a Telmark representative about his dispositions of the Bale Wrapper and the Forage Chopper prior to April 6, 1999, and that the Telmark representative approved of such dispositions provided that the Debtor agreed to (a) make all future lease payments relative to the lease that pertained to each of the two disposed pieces of equipment, as well as (b) pay the payoff figure that pertained to each such piece of equipment.

The lease agreements for the leases regarding each of the 3 Pieces of Equipment require the Debtor (a) to keep such equipment at his place of business, to disallow the use of such equipment by anyone other than himself or his employees, and to disallow the rental or sublet of any of such equipment without the prior written consent of Telmark, see Telmark Trial Ex's. 1–3 (lease agmt's. for the 3 Pieces of Equipment, ¶ 8), and (b) to promptly notify Telmark in writing of any loss, theft, damage or destruction to such equipment, see Id. (lease agmt's. for the 3 Pieces of Equipment, ¶ 17). Certain of the lease agreements for certain of the 17 leases outstanding between the parties as of April 6, 1999, also contain language providing, inter alia, that a default under any other lease between the parties constitutes a default under the lease with such cross default language (hereafter "the Cross Default Language"). See Telmark Trial Ex. 6 (certain of the lease agmt's. other than for the 3 Pieces of Equipment, ¶ 14). Notably, none of the lease agreements pertaining to the 3 Pieces of Equipment contain the Cross Default Language; as well, lease agreements for certain of the parties' other 17 outstanding leases fail to contain such language. However, the lease agreements that do not contain the Cross Default Language contain other language to the effect that Telmark, if it deems itself insecure, may proceed to exercise any of the remedies contained in such lease agreements (hereafter "the Insecurity Language"). See, e.g., Telmark Trial Ex's. 1–3 (lease agmt's. for the 3 Pieces of Equipment, ¶ 15). Finally, the Cross–Collateralization Agreement provides, inter alia, that the Debtor is prohibited from selling or otherwise disposing of any of the equipment leased between the parties without Telmark's written consent, see Tel-

mark Trial Ex. 4 (Cross–Collateralization Agreement, ¶ 4), and that a violation of any provision in the Cross–Collateralization Agreement constitutes grounds for accelerating future payments due under all of the leases between the parties, *see Id.* (Cross–Collateralization Agreement, ¶ 8).

Based upon the disposals of the 3 Pieces of Equipment, as well as the above language from both the lease agreements for each of the leases between the parties and the Cross–Collateralization Agreement, Telmark maintains that it has a viable breach of contract claim against the Debtor. Such lease agreements, as well as the Cross–Collateralization Agreement, also provide that, in the event of a default thereunder, Telmark may, *inter alia,* accelerate all of the leases that then exist between the parties such that all remaining amounts due under such leases become due and payable immediately. *See* Telmark Trial Ex's. 1–3 (lease agmt's. for the 3 Pieces of Equipment, ¶ 15); Telmark Trial Ex. 4 (Cross–Collateralization Agreement, ¶ 8). Telmark asserts that, by exercising its aforesaid rights of acceleration, it has a claim for breach of contract equal to $231,741.66. Although Telmark has filed a proof of claim in the instant bankruptcy case regarding its claim, such claim is presently neither liquidated nor, for that matter, even the subject of a pending state court action by Telmark.

Telmark now argues that (a) the Debtor not only failed to inform Telmark of the disposals of the 3 Pieces of Equipment but also that (i) the Debtor had a legal duty to inform Telmark of such disposals, and (ii) each such failure to inform, or omission, on the Debtor's part (hereafter "the Nondisclosures") constitutes a misrepresentation by the Debtor, (b) the Debtor made such misrepresentations to Telmark with fraudulent intent, (c) it would not have entered into any of the leases between the parties

subsequent to any of the disposals of the 3 Pieces of Equipment had it known about such disposals when they first occurred, (d) it likewise would have moved to immediately accelerate all of the leases between the parties had it been aware of, and upon learning of, any of the disposals of the 3 Pieces of Equipment, (e) each failure by Telmark to so accelerate each of the leases between the parties constitutes, within the meaning of 11 U.S.C. § 523(a)(2), an extension of credit, (f) the Nondisclosures are, in light of the effect that they had on Telmark, material within the meaning of § 523(a)(2), as well as something upon which Telmark actually relied and for which Telmark suffered damages, (g) such reliance by Telmark was justifiable, and (h) such misrepresentations by the Debtor are thus actionable under § 523(a)(2)(A). Telmark also argues at this time that the alleged implied representation which the Debtor made to Telmark on April 9, 1999, by virtue of the Debtor's adoption of Schedule A, namely that the Debtor actually still possessed each piece of equipment listed in such schedule on April 9, 1999, is equally actionable under § 523(a)(2)(A). Telmark argues as much because, in turn, Telmark argues that (a) such implied representation was materially false given that, and as the Debtor knew at the time of such representation, the Debtor had disposed of at least two of the 3 Pieces of Equipment prior to the making of such representation, (b) such implied representation induced Telmark to refrain from accelerating each of the leases between the parties, which forbearances by Telmark, it argues, constitute, within the meaning of 11 U.S.C. § 523(a)(2), extensions of credit, (c) the Debtor made such implied representation with fraudulent intent, and (d) it both actually and justifiably relied upon such implied representation, which reliance, according to Telmark, caused Telmark to incur substantial damages.

Telmark also argues that its claim against the Debtor is, pursuant to § 523(a)(4), nondischargeable as a debt for embezzlement. Finally, Telmark argues that its claim is one for conversion, thereby making such claim likewise nondischargeable under § 523(a)(6) as a debt for willful and malicious injury to property of Telmark.

In addition to defending against Telmark's nondischargeability action, the Debtor objects to Telmark's breach of contract claim, arguing essentially that such claim should be extinguished on the ground that (a) Telmark has failed to dispose of the leased equipment in a commercially reasonable manner, and (b) if Telmark had so disposed of the leased equipment, then the proceeds from such disposition would have been sufficient to satisfy Telmark's claim against the Debtor. The Debtor maintains, and Telmark conceded at trial, that the Debtor tendered, or offered to surrender, to Telmark in March 2000 all of the leased equipment for which Telmark still had title, as well as all of the equipment that the Debtor then owned which constituted collateral of Telmark, provided that the Debtor had not previously disposed of such equipment. The parties agree that, such tender by the Debtor notwithstanding, Telmark failed to take possession of such equipment in March 2000 and has not, as of the present time, acted to take such possession. With respect to the equipment to which both parties refer, the Court notes that certain of such equipment presently constitutes (a) property of the Debtor, (b) collateral of Telmark, and (c) property that consequently is subject to the UCC Article 9 standard of commercially reasonable disposition. However, certain of such equipment, on the other hand, presently constitutes (a) property still subject to a lease between the parties, (b) property to which Telmark conse-

quently holds title, (c) property that consequently does not constitute collateral of Telmark, and (d) property that consequently is subject to UCC Article 2A disposition standards in contrast to the UCC Article 9 standard of commercially reasonable disposition. Finally, the Debtor maintains, and Telmark does not dispute, that the Debtor remained current on all of his obligations under all leases that were outstanding between the parties up until March 2000, which is the date of the aforesaid tender by the Debtor.

## DISCUSSION

**I. *Telmark's § 523(a)(2)(A) Nondischargeability Cause of Action.***

**A. *Applicable law.***

■ 11 U.S.C. § 523(a)(2)(A) & (B) provides, in pertinent part, as follows:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; [or]

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C.A. § 523(a)(2)(A) & (B) (West 1993). In order for a debt to be excepted from discharge under § 523(a)(2)(A), a creditor must prove the following elements by a preponderance of the evidence:

(1) the debtor made ... [a] representation;

(2) [at] the time of the representation, the debtor knew it to be false;

(3) the debtor made the representation with the intent and purpose of deceiving the plaintiff;

(4) the plaintiff ... [justifiably] relied on the representation ...; and

(5) the plaintiff sustained a loss or damage as the proximate consequence of the representation having been made.

4 *Collier on Bankruptcy*, ¶ 523.08[1][d] at 523–43 to 44 (Bender 2000) (citing *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), to the effect that reliance required of a creditor is justifiable rather than reasonable under § 523(a)(2)(A)) & ¶ 523.08[1][e] at 523–45 to 46 (setting forth 5–part test); *see also, e.g., In re Orndorff*, 162 B.R. 886, 888 (Bankr.N.D.Okla.1994) (same test); *In re Homschek*, 216 B.R. 748, 751 (Bankr. M.D.Pa.1998) (same test).

■ Furthermore, the representation made by a debtor upon which a creditor predicates an action under § 523(a)(2)(A) cannot, consistent with the express language of § 523(a)(2)(A) & (B), pertain to said debtor's financial condition; representations regarding a debtor's financial condition are only actionable under § 523(a)(2)(B), and then only if the same are made in writing. *See* 11 U.S.C.A. § 523(a)(2)(A) & (B); 4 *Collier on Bankruptcy*, ¶ 523.08[1] at 523–41; *Orndorff*, 162 B.R. at 888–890; *Homschek*, 216 B.R. at 752–753.

■ Finally, but as a threshold matter under either § 523(a)(2)(A) or (B), a creditor must demonstrate not only that a debtor made a fraudulent misrepresentation but also that such debtor obtained "money, property, services, or an extension, renewal, or refinancing of credit" from such creditor by virtue of said misrepresentation. *See* 11 U.S.C.A. § 523(a)(2) (plain language of § 523(a)(2) preceding paragraphs (A) through (C) confirms as much); 4 *Collier on Bankruptcy*, ¶ 523.08[1][d] at 523–43 & ¶ 523.08[1][a] at 523–41 to 42 (the preceding follows because "[n]ot all frauds are included within the exception of section 523(a)(2)(A), but only those involved in the obtaining of money, property[,] ... services[, or an extension, renewal, or refinancing of credit]"). The preceding showing, which emanates from the phrase "obtained by," is, the Court finds, identical to, and is satisfied by, a showing of "actual reliance" on a creditor's part, *see, e.g., In re Bird*, 224 B.R. 622, 630 (Bankr.S.D.Ohio 1998) ("No one, of course, doubts that some degree of *reliance* is required to satisfy the element of causation inherent in the phrase '*obtained by*' "), which latter showing is also a required element under either § 523(a)(2)(A) or (B), *see, e.g., Id.* ("Both actual and justifiable reliance are required"); *In re Creta*, 271 B.R. 214, 217 (1st Cir. BAP 2002) ("actual reliance" constitutes a separate element of a 6–part test under § 523(a)(2)(A)); *In re Pauley*, 205 B.R. 501, 507 (Bankr.W.D.Mich.1997) ("the [U.S.] Supreme Court's requirement of 'justifiable' reliance[ ] necessarily assumes proof of actual reliance"); 4 *Collier on Bankruptcy*, ¶ 523.08[2][d] at 523–49. The "obtained by" or "actual reliance" requirement is further equated with the damage causation element for a cause of action under § 523(a)(2)(A). *See, e.g., In re Mercer*, 246 F.3d 391, 413 & n. 25 (5th Cir. 2001) (citing several cases); *Bird*, 224 B.R. at 630 (see parenthetical for first citation to *Bird*). The Court, therefore, will treat

the "obtained by," actual reliance, and damage causation elements for a cause of action under either § 523(a)(2)(A) or (B) as one and the same. Additionally, because a creditor necessarily cannot demonstrate that a debtor obtained requisite consideration from such creditor by virtue of, or actually relied upon, a misrepresentation if such debtor obtained such consideration prior to having made said misrepresentation, *see* 4 *Collier on Bankruptcy*, ¶ 523.08[1][d] at 523–43 ("If the [money,] property[,] services[, etc.] w[as] obtained before the making of any false representation, subsequent misrepresentations[—that is, misrepresentations made subsequent to the obtaining of said money, property, services, etc.—]will have no effect on dischargeability"), such creditor, in order to prevail under § 523(a)(2)(A) or (B), must prove that such debtor made an actionable misrepresentation prior to such debtor's acquisition of such consideration from such creditor.

The Court shall proceed to apply the above law to Telmark's § 523(a)(2)(A) cause of action.

### B. Did the Debtor obtain "money, property, services, or an extension, renewal, or refinancing of credit" from Telmark?

Telmark argues that the Nondisclosures induced Telmark to (a) enter into each of the leases between the parties that were executed subsequent to each of the disposals of the 3 Pieces of Equipment, and (b) forbear from immediately accelerating all of the leases that existed between the parties as of each disposal. Telmark also argues that the Debtor's adoption of Schedule A likewise induced Telmark to forbear from such acceleration of leases. ▮ The Court finds, without question, that the leases between the parties herein constitute "property" within the

meaning of § 523(a)(2). *See In re O'Connor,* 145 B.R. 883, 890–891 (Bankr. W.D.Mich.1992). Telmark maintains that its forbearance from exercising its right under each lease agreement and the Cross–Collateralization Agreement to accelerate all of the leases between the parties constitutes an "extension of credit" within the meaning of § 523(a)(2).

As support for its "extension of credit" argument, Telmark relies on the decision in *Field v. Mans,* 157 F.3d 35 (1st Cir. 1998). The *Mans* court held that a forbearance from the exercise of a right to accelerate the maturity date of an existing debt constitutes an extension of credit within the meaning of § 523(a)(2). *See Mans,* 157 F.3d at 43–46. The Court identifies as an initial issue whether the *Mans* decision is even relevant to the instant matter given that *Mans* dealt with a loan or a credit purchase rather than, as is the case in the instant matter, a lease. However, the Court will accept, at least for the instant adversary proceeding, that Telmark's failure to accelerate leases is indistinguishable from a failure to accelerate debt. The Court accepts as much because (a) the only way that the Court can significantly distinguish between a forbearance to accelerate the maturity date of a debt incurred via a loan or credit purchase, on the one hand, and Telmark's forbearance to accelerate the total amount due under all of the leases between the instant parties, on the other hand, is if the Court holds that Telmark did not grant credit to the Debtor in the first instance when the parties entered into such leases, *see In re Marx,* 138 B.R. 633, 636 (Bankr.M.D.Fla. 1992) (an "extension of credit" within the meaning of § 523(a)(2) "necessarily template[s] the prior granting of credit to the debtor and arrangements to continue ... [such] credit when the debtor cannot repay according to the original terms"),

and (b) the Court does not see how it can hold that Telmark failed to grant credit to the Debtor in the first instance when the parties entered into their leases.[1]

Unfortunately for Telmark, that the Court accepts that it cannot distinguish between a failure to accelerate debt and Telmark's failure to accelerate leases constitutes a hollow victory for Telmark because the Court now holds, as it has in the past, that a mere forbearance from the exercise of any acceleration right, without more, does not constitute an "extension of credit" the type of which may be excepted from discharge pursuant to § 523(a)(2). The Court holds as it does because:

> the Court is convinced that Congress, when using the phrase "extension, renewal, or refinancing of credit" in § 523(a)(2), had in mind an enforceable agreement to extend, renew, or refinance pre-existing credit, which agreement would simultaneously (a) extinguish the pre-existing indebtedness that is the subject of said extension, renewal, or refinancing, and (b) provide a creditor with a right to payment. Support for

the Court's interpretation can be found in the plain language of § 523(a)(2), which subparagraph excepts from an individual debtor's discharge not merely "an extension, renewal, or refinancing of credit," but rather "any *debt* ... for ... [such] an extension, renewal, or refinancing." *See* 11 U.S.C.A. § 523(a)(2) (emphasis added). Because § 523(a)(2), by its plain language, only excepts from discharge a debt that results from, *inter alia*, "an extension, renewal, or refinancing of credit," only extensions, renewals, or refinancings of credit that legally result in a debt are contemplated under § 523(a)(2). An extension, renewal, or refinancing of credit cannot result in a debt, however, unless the pre-existing indebtedness which is the subject of said extension, renewal, or refinancing is extinguished at the same time. This point is axiomatic because a debtor will not be simultaneously indebted to a creditor for an initial advance of credit and for the subsequent extension, renewal, or refinancing of the same credit. Furthermore, if § 523(a)(2) only contemplates

---

1. The Court feels constrained to conclude that each of the leases between the parties herein constitute every bit the credit transaction that is a typical loan or purchase on credit because each such lease (a) conveys to the Debtor a right to possess and use the equipment subject to such lease for a period of 60 to 62 months, (b) obligates the Debtor, from the date of execution thereof, to pay the total sum due as return consideration for such conveyance, and (c) allows the Debtor to satisfy such total sum due over the course of the 60– to 62–month period via installments rather than upfront at the time of lease execution, which feature constitutes the granting of credit. *See O'Connor*, 145 B.R. at 890 (a lease for residential property "is a credit transaction to the extent that the lessee is obligated to pay for the right of possession which is transferred in exchange for the lessee's obligation to pay rent").

The Court notes as well that, if the leases between the parties constitute disguised in-

stallment sales/purchases rather than true leases, then such leases clearly constitute credit transactions. However, Telmark failed to argue at the September 18, 2002 trial that any of the leases between the parties that were outstanding as of April 6, 1999, are anything other than true leases. Moreover, Telmark failed to produce at trial any of the evidence that would be necessary to ascertain whether such leases are other than true leases, such as evidence regarding the useful lives of the leased equipment and the fair market value of such equipment on the date that the Debtor had the option of purchasing the same. Therefore, the Court must find that such leases constitute true leases. Nevertheless, because the Court holds, at least for purposes of the instant adversary proceeding, that the leases between the instant parties constitute credit transactions, it matters not whether the leases between the parties constitute true leases.

extensions, renewals, or refinancings of credit that legally result in a debt, then an extension, renewal, or refinancing of credit, in order for it to be among those contemplated under § 523(a)(2), must also provide a creditor with a right to payment given that (a) the term "debt" is defined in the Bankruptcy Code as a "liability on a claim," *see* 11 U.S.C.A. § 101(12) (West 1993), and (b) the term "claim" is defined in the Bankruptcy Code as a "right to payment." *See* 11 U.S.C.A. § 101(5)(A) (West 1993).

Thus, if an extension, renewal, or refinancing of credit extinguishes pre-existing indebtedness which is the subject of the same and provides a creditor with a right to payment, then (a) said extension, renewal, or refinancing of credit creates debt, (b) the debt which is the subject of a creditor's nondischargeability complaint is necessarily the later debt (i.e., that which is established by the extension, renewal, or refinancing of credit) since the prior debt no longer exists, and (c) the issue of fraud on the debtor's part is only relevant as it pertains to the securing by the debtor of the later debt. However, if an extension, renewal, or refinancing of pre-existing indebtedness neither extinguishes pre-existing indebtedness nor provides a creditor with a right to payment, then the pre-existing debt necessarily remains, which pre-existing debt continues to provide the creditor with its right to payment. In that eventuality, (a) the debt that was established by the initial advance(s) of credit necessarily must be the subject of a creditor's nondischargeability complaint since a subsequent debt is never established, and (b) the issue of fraud on the debtor's part is only relevant as it pertains to the securing by the debtor of the initial advances of credit.

．　　．　　．　　．　　．　　．

This Court, in deciding as it does, is acutely aware of, but nevertheless respectfully disagrees with, decisions by a number of bankruptcy courts which hold that the mere forbearance from either making demand upon a demand note or otherwise accelerating the due date of an obligation, without more, constitutes an extension of credit within the meaning of § 523(a)(2). *See In re Plechaty,* 213 B.R. 119, 124–26 (6th Cir. BAP 1997); *In re Hoffman,* 80 B.R. 924, 926–27 (Bankr.N.D.Ill.1988); *In re Mancini,* 77 B.R. 913, 914–16 (Bankr.M.D.Fla. 1987); *In re Eaton,* 41 B.R. 800, 802–03 (Bankr.E.D.Wis.1984). Instead, this Court sides with existing case authority which directly supports its decision. *See In re Bacher,* 47 B.R. 825, 829 (Bankr. E.D.Pa.1985); *In re Colasante,* 12 B.R. 635, 636–38 (E.D.Pa.1981), *aff'g on other grounds* Nos. 73–285 to 287, slip. op. (Bankr.E.D.Pa.1980); *In re Schmidt,* 70 B.R. 634, 644–45 (Bankr.N.D.Ind.1986); and *In re Campbell,* 159 F.3d 963, 967–69 (6th Cir.1998) (dissenting opinion). Furthermore, this Court's decision is consistent with, rather than contrary to, the holdings in *In re Robinson,* 192 B.R. 569 (Bankr.N.D.Ala.1996), *In re Campbell,* 159 F.3d 963 (6th Cir.1998), and *In re Cerar,* 84 B.R. 524 (Bankr.C.D.Ill. 1988), because in each of those decisions the extension of credit at issue resulted in new debt which extinguished pre-existing indebtedness. *See Robinson,* 192 B.R. at 573 (2 pre-existing notes "were incorporated into one master note"); *Campbell,* 159 F.3d at 966 (an enforceable agreement to forbear existed in exchange for new promises given by the debtor); *Cerar,* 84 B.R. at 529 (substitution of a forged note for the original note, thereby extending the repayment of the issued credit); *see also Campbell,*

159 F.3d at 969 (dissenting opinion reconciling cases on the subject).

*In re Buzzelli,* Bankr.No. 97–23888–MBM, Adv. No. 98–2056–MBM (Mem. Opinion dated Feb. 25, 1999), at 13–17. Applying the above to the instant matter, the Court finds that Telmark's extension of credit in the form of its failures to accelerate leases neither (a) extinguished the pre-existing indebtedness of the Debtor since the Debtor remains liable on the lease agreements that were initially entered into between the parties, nor (b) provided Telmark with a right to payment since Telmark's only right to payment continues to emanate from those same initial lease agreements. Consequently, Telmark's forbearance from the acceleration of leases does not constitute an "extension of credit" the type of which may be excepted from discharge pursuant to § 523(a)(2). In light of the foregoing, (a) the debt that was established by Telmark's original advances of credit necessarily comprises the subject of Telmark's instant nondischargeability complaint since a subsequent debt was never legally established, (b) the issue of fraud on the Debtor's part is only relevant as it pertains to the Debtor's securing of said original advances of credit from Telmark, and (c) it matters not, for purposes of analysis under § 523(a)(2), how the Debtor induced Telmark to forbear from accelerating the leases between the parties.

Therefore, the Debtor received property from Telmark in the form of the leases that were entered into between the parties. However, such leases constitute the only consideration that the Debtor obtained from Telmark that is also relevant for § 523(a)(2) purposes because Telmark's forbearance from exercising its right under each lease agreement and the Cross–Collateralization Agreement to accelerate all of the leases between the parties constitutes neither property nor an extension of credit within the meaning of § 523(a)(2).

### C. Do the Nondisclosures and the Debtor's adoption of Schedule A constitute misrepresentations?

#### 1. The Nondisclosures.

■ The Court concludes that the Nondisclosures can constitute misrepresentations within the meaning of § 523(a)(2)(A) only if the Debtor, when he failed to inform Telmark of the dispositions of the 3 Pieces of Equipment, then had a duty to disclose such information to Telmark. *See, e.g., In re Docteroff,* 133 F.3d 210, 216 (3rd Cir.1997); *In re Phillips,* 153 B.R. 758, 761 (Bankr.E.D.Mich.1993); *In re Grogan,* 146 B.R. 866, 870–871 (Bankr.M.D.Fla.1992). Furthermore, relevant caselaw seems to hold that a failure to discharge a duty to disclose constitutes a misrepresentation within the meaning of § 523(a)(2)(A) only if a special relationship exists between parties, such as a fiduciary relationship, *see Phillips,* 153 B.R. at 761; *Grogan,* 146 B.R. at 870–871; *In re Tallant,* 218 B.R. 58, 65 (9th Cir. BAP 1998) (relying on Restatement (Second) of Torts § 551(2)); *Baribault v. Peoples Bank of Oxford,* 714 A.2d 1040, 1041–1043 (Pa.Super.Ct.1998) (Pennsylvania recognizes and adopts Restatement (Second) of Torts § 551), or "where one party has superior knowledge that is not within the fair and reasonable reach of (or could not in the exercise of reasonable diligence be obtained by) the other party to the transaction," *Phillips,* 153 B.R. at 761.

■ The Court cannot find that the Debtor's disposal of any of the 3 Pieces of Equipment constitutes knowledge that Telmark itself could not easily have obtained given that, and as Telmark conceded at trial, a representative from Telmark often visited the Debtor's business premises and asked questions of the Debt-

or. As for the nature of the relationship between Telmark and the Debtor, Telmark does not argue that such relationship approaches one of a fiduciary nature—the Court summarily holds that such relationship is not fiduciary in nature. Nevertheless, Telmark maintains that language in the lease agreements for the leases regarding each of the 3 Pieces of Equipment, as well as language in the Cross–Collateralization Agreement, imposed upon the Debtor a duty to disclose his disposals of such equipment, and that his failure to discharge such contractual duty to disclose constitutes a misrepresentation for purposes of § 523(a)(2)(A). The Court disagrees, however, and holds, as a matter of law, that a mere contractual duty to disclose cannot, without more, serve to create the type of relationship that is required such that a failure to discharge such duty

will constitute a misrepresentation and result in liability for fraudulent nondisclosure. *See Phillips,* 153 B.R. at 761 ("To find a duty to disclose, the failure of which constitutes fraud in this case would be in effect to convert most breaches of existing contracts into fraudulent actions precluding discharge—a result this court believes not to be one required or permitted under the [Bankruptcy] Code"); *Tallant,* 218 B.R. at 65 (confining actionable failure to disclose under § 523(a)(2)(A) to failures to disclose that result in liability for fraudulent nondisclosure under the Restatement (Second) of Torts § 551(2), which nondisclosures seem to require more than a mere contractual duty to disclose).

Therefore, the Court concludes that the Nondisclosures do not constitute misrepresentations within the meaning of § 523(a)(2)(A).[2]

2. Even if a contractual duty to disclose will, by itself, suffice to create the type of relationship that is required such that a failure to discharge such duty will constitute a misrepresentation for purposes of § 523(a)(2)(A), the Court doubts that the bulk of the contractual language that Telmark refers the Court to imposed upon the Debtor a duty to disclose his disposals of the 3 Pieces of Equipment.

First, with respect to the language in the lease agreements that requires the Debtor to notify Telmark of any "loss, theft, damage or destruction" regarding leased equipment, the Court notes that such language is solely contained within a section of each lease agreement that is headed "Risk of Loss." Because of such placement of the language in question, the Court cannot conclude that such language refers to a physical dispossession of equipment that necessarily accompanies an intentional, voluntary disposition of equipment. Since the Debtor intentionally and voluntarily disposed of the 3 Pieces of Equipment, the Court is thus constrained to conclude that such contractual language did not impose upon the Debtor a duty to inform Telmark of such disposals.

Second, with respect to the language in the lease agreements that requires the Debtor to seek advance consent from Telmark before

the Debtor can rent or sublet any leased equipment, such language is simply irrelevant to the matter at hand given that (a) the Debtor, in disposing of the 3 Pieces of Equipment, neither rented nor sublet the same, and (b) such language does not impose upon the Debtor a duty to disclose to Telmark dispositions that occurred other than by way of rental or subletting.

Finally, the language in the Cross–Collateralization Agreement requiring the Debtor to seek advance consent from Telmark before the Debtor voluntarily disposed of, *inter alia,* the 3 Pieces of Equipment does not explicitly impose upon the Debtor a duty to notify Telmark of such voluntary dispositions that are effected without such advance consent. Nevertheless, the Court can accept that such language implicitly imposes upon the Debtor a duty to notify Telmark of any voluntary disposition of, *inter alia,* the 3 Pieces of Equipment even absent such advance consent. Notwithstanding the presence of such duty to disclose, however, a failure to discharge such duty by the Debtor could only have constituted a misrepresentation (a) if the Court were to agree with Telmark that a mere contractual duty to disclose can, without more, serve to create the type of relationship that is required such that a failure to discharge such duty will

### 2. *The Debtor's adoption of Schedule A.*

■■■ The Court finds that the Debtor, by adopting Schedule A on April 9, 1999, via his execution on the same date of both the UCC Financing Statement and the Cross–Collateralization Agreement, represented, albeit implicitly, to Telmark that, on April 9, 1999, he actually still possessed each piece of equipment listed in such schedule. The Court recognizes that the Debtor (a) disputes having been aware of the purpose for which Schedule A was attached to the UCC Financing Statement, and (b) argues, in turn, that, by executing such financing statement, he did not mean to represent that he still possessed all of the equipment listed in such schedule. Unfortunately for the Debtor, the Court disbelieves the Debtor on this particular point and, instead, finds as fact that the Debtor, by adopting Schedule A, did indeed represent to Telmark that he possessed on April 9, 1999, each piece of equipment listed in such schedule.

Because the Debtor concedes that he disposed of the Bale Wrapper and Forage Chopper well before April 9, 1999, and since the Court must find that the Debtor was aware of such dispositions when he adopted Schedule A on April 9, 1999, the Court must also find that the Debtor, by virtue of such adoption, knowingly misrepresented to Telmark on such date that he still possessed such pieces of equipment.

With respect to the Corn Planter, however, the Court finds that Telmark has failed to preponderantly prove that the Debtor disposed of such piece of equipment on or before April 9, 1999. The only evidence regarding the date of disposition of the Corn Planter is a stipulation between the parties that the Corn Planter was disposed of between April 9, 1999, and May 5, 1999, which stipulation (a) establishes, to the detriment of Telmark, that such piece of equipment had not been disposed of before April 9, 1999, and (b) fails to establish that the Debtor disposed of such piece of equipment on April 9, 1999. Because Telmark has failed to preponderantly prove that the Debtor disposed of the Corn Planter on or before April 9, 1999, Telmark consequently also fails to preponderantly prove that the Debtor made a false representation and, thus, a misrepresentation to Telmark when the Debtor represented on April 9, 1999, that he still possessed, in particular, the Corn Planter.

Therefore, the Court can conclude nothing more than that the Debtor, by adopting Schedule A, misrepresented to Telmark that he owned, as of April 9, 1999, the Bale Wrapper and the Forage Chopper. The Court cannot conclude that the Debtor's adoption of Schedule A resulted in a misrepresentation by the Debtor regarding possession of the Corn Planter on April 9, 1999.

constitute a misrepresentation for purposes of § 523(a)(2)(A), which proposition the Court cannot accept, and (b) in any event on or after the date that such duty arose, which date was April 9, 1999, given that such date is when the Debtor executed the Cross–Collateralization Agreement. That the Debtor's failure to discharge such duty imposed by the Cross–Collateralization Agreement could, in any event, only have constituted a misrepresentation on or after April 9, 1999, is, as it turns out, as fatal to Telmark's § 523(a)(2)(A) cause of action vis-a-vis the Nondisclosures as the

Court's holding that the Nondisclosures do not constitute misrepresentations within the meaning of § 523(a)(2)(A). The Court must draw the preceding conclusion because (a) misrepresentations are only actionable under § 523(a)(2)(A) if, and to the extent that, they induce a creditor to provide relevant consideration for purposes of § 523(a)(2), *see supra* pp. 200–01, and (b) the Debtor did not obtain any consideration from Telmark of relevance for purposes of § 523(a)(2) after April 6, 1999, which date is when Telmark granted the April 6, 1999 Lease, *see infra* p. 207.

### 3. *Summary.*

■ In light of the foregoing, the Court concludes that the only misrepresentations that the Debtor made within the meaning of § 523(a)(2)(A) are those that he made on April 9, 1999, by virtue of his adoption of Schedule A on the same date, that he then possessed the Bale Wrapper and the Forage Chopper (hereafter "the Schedule A Misrepresentations"). Furthermore, and more importantly, because the Schedule A Misrepresentations were made subsequent to Telmark's granting of each lease between the parties, including the April 6, 1999 Lease, the Debtor could not possibly have received any of such leases by virtue of such misrepresentations. Therefore, the only thing that may have been induced by the Schedule A Misrepresentations would be Telmark's forbearance on April 9, 1999, and thereafter from accelerating existing leases between the parties. However, and as the Court has already held, such forbearance by Telmark constitutes neither property nor an extension of credit within the meaning of § 523(a)(2), which means that the Debtor did not obtain any consideration from Telmark of relevance for purposes of § 523(a)(2) by virtue of the Schedule A Misrepresentations. Since misrepresentations are only actionable under § 523(a)(2)(A) if, and to the extent that, they induce a creditor to provide relevant consideration for purposes of § 523(a)(2), *see supra* pp. 200–01, and because the Debtor did not obtain any consideration from Telmark of relevance for purposes of § 523(a)(2) by virtue of the Schedule A Misrepresentations, the Schedule A Misrepresentations are not actionable under § 523(a)(2)(A). Of course, since the only misrepresentations that the Debtor made within the meaning of § 523(a)(2)(A) are the Schedule A Misrepresentations, and since such misrepresentations are not actionable under § 523(a)(2)(A), Telmark necessarily cannot prevail on its § 523(a)(2)(A) cause of action. Accordingly, the Court, if it were so inclined, could end its analysis of such cause of action at this time. Nevertheless, the Court will proceed to analyze several of the other elements that must be established in order for Telmark to prevail under § 523(a)(2)(A).

### D. *Did Telmark actually rely upon, or did Telmark incur damages as a result of, misrepresentations that were made by the Debtor?*

■ As set forth above, resolution of this issue also answers whether the Debtor obtained from Telmark, or induced Telmark to provide, consideration of relevance for purposes of § 523(a)(2) by virtue of misrepresentations that were made by the Debtor. *See supra* p. 200.

Pertinent to a resolution of this issue is the finding that the Court now makes that the Debtor informed a Telmark representative about his dispositions of the Bale Wrapper and the Forage Chopper prior to April 6, 1999, and that the Telmark representative approved of such dispositions provided that the Debtor agreed to (a) make all future lease payments relative to the lease that pertained to each of the two disposed pieces of equipment, as well as (b) pay the payoff figure that pertained to each such piece of equipment. Because the Court makes the preceding finding, the Court must necessarily (a) find that Telmark was aware on April 9, 1999, that the Debtor had previously disposed of the Bale Wrapper and the Forage Chopper, (b) find, consequently, that Telmark was also aware on April 9, 1999, that the Debtor was not in possession of either such piece of equipment on such date, and (c) conclude that Telmark did not actually rely on, and thus did not incur damages as a

result of, the Schedule A Misrepresentations.

The Court must also conclude that, even if the Nondisclosures regarding the Debtor's disposition of the Bale Wrapper and the Forage Chopper constitute misrepresentations within the meaning of § 523(a)(2)(A), Telmark did not actually rely on, or incur damages as a result of, such Nondisclosures. As an initial matter, and of course, such Nondisclosures could not have occurred subsequent to the point in time when the Debtor informed the Telmark representative of the dispositions of such equipment, which date of notification by the Debtor the Court will not endeavor to isolate other than to find that such notification date preceded April 6, 1999. The Court must conclude that Telmark did not actually rely on, or incur damages as a result of, such Nondisclosures because (a) the Court finds that, by conditionally approving of the dispositions of the Bale Wrapper and the Forage Chopper upon learning of such dispositions, Telmark ratified such conversions of its property, (b) Telmark, at least to the Court's knowledge, has failed to even produce evidence, either testimonial or otherwise, to the effect that it would have refused to enter into any further leases with the Debtor, and that it would have moved immediately to accelerate all of the existing leases between the parties, if it had learned of such dispositions prior to the date upon which it ratified such dispositions, (c) the Court, given its finding that Telmark ultimately ratified the dispositions of such equipment, could not accept as credible in any event evidence to the effect that Telmark would have acted other than to ratify such dispositions if Telmark had learned of such dispositions when they

first occurred, and (d) the Court thus finds, instead, that Telmark would have proceeded to grant future leases to the Debtor and would have forbore from accelerating existing leases between the parties even if the Debtor had notified Telmark of the dispositions of the Bale Wrapper and the Forage Chopper when such dispositions first occurred.

The Court must also conclude that, even if the Nondisclosures regarding the Debtor's disposition of the Corn Planter constitute misrepresentations within the meaning of § 523(a)(2)(A), Telmark did not actually rely on, or incur damages as a result of, such Nondisclosures. The Court concludes as it does only in part because of the fact that, to the Court's knowledge, Telmark has failed to even produce evidence, either testimonial or otherwise, to the effect that Telmark would have moved immediately to accelerate all of the existing leases between the parties if Telmark had ever learned of the Debtor's disposition of the Corn Planter.[3] The Court also concludes as it does because, even if Telmark had produced such evidence, the Court would have experienced problems with accepting same in light of the fact that (a) the Debtor, by disposing of the Corn Planter, was only disposing of what constituted essentially worthless property given that (i) the Corn Planter had been severely damaged prior to its disposition, and (ii) the Debtor only received $1,500 by virtue of such disposition, (b) such a course of action by Telmark likely would have simply thrown the Debtor into bankruptcy immediately, which bankruptcy the Debtor ultimately filed for just over one year later, (c) Telmark was aware of such adverse financial

---

3. Because the parties stipulate that the Debtor did not dispose of the Corn Planter before April 9, 1999, and since the last lease executed between the parties was the April 6, 1999 Lease, Telmark cannot possibly argue that it would have refrained from entering into leases with the Debtor if it had known about the Debtor's disposition of the Corn Planter.

circumstances of the Debtor as early as April 9, 1999, given that such knowledge of Telmark is what prompted Telmark to seek the Debtor's execution of the Cross–Collateralization Agreement, and (d) the Court cannot find that Telmark wished to force the Debtor into bankruptcy in April 1999, given the number of lease relationships that then existed between the parties.

Finally, the Court understands Telmark to argue that it may satisfy the actual reliance/damage causation/inducement (i.e., "obtained by") element under § 523(a)(2)(A) without affirmatively proving by a preponderance of the evidence that, had it timely learned of the dispositions in question, it would have refused to enter into any further leases with the Debtor and/or that it would have moved immediately to accelerate all of the existing leases between the parties. *See* Telmark Pretrial Br. (Docket # 28), at pp. 11–12. Telmark cites to the decisions in *Mans, In re Campbell,* 159 F.3d 963 (6th Cir.1998), and *In re Biondo,* 180 F.3d 126 (4th Cir.1999), as supportive of such argument. The Court rejects such argument by Telmark, however, and holds instead that Telmark, in order to satisfy the actual reliance/damage causation/inducement (i.e., "obtained by") element under § 523(a)(2)(A), must preponderantly prove that, had it timely learned of the dispositions in question, it would have refused to enter into any further leases with the Debtor and/or that it would have moved immediately to accelerate all of the existing leases between the parties. Furthermore, the Court concludes that Telmark misconstrues the *Biondo, Mans,* and *Campbell* decisions, and that such deci-

sions actually support the Court's holding as set forth in the preceding sentence. In particular, the *Biondo* and *Campbell* courts wrestled with the issue of whether a creditor must prove more than that it simply was induced to extend credit in order to satisfy the actual reliance/damage causation/ inducement (i.e., "obtained by") element under § 523(a)(2)(A) and (B). *See Biondo,* 180 F.3d at 135; *Campbell,* 159 F.3d at 966–967. The *Biondo* and *Campbell* courts held that preponderant proof of such inducement is all that is necessary for a creditor to satisfy such element. *See Biondo,* 180 F.3d at 135; *Campbell,* 159 F.3d at 966–967. Unfortunately for Telmark, however, the *Biondo* and *Campbell* courts neither held nor even intimated that a creditor can satisfy such element without affirmatively proving such inducement by a preponderance of the evidence. As for the *Mans* decision, the *Mans* court only held therein that a creditor need not prove such inducement in order to establish that, by virtue of a mere failure to accelerate, it has extended credit within the meaning of § 523(a)(2). *See Mans,* 157 F.3d at 45–46. Because the *Mans* court's discussion regarding proof of inducement occurred only within the context of its decision regarding whether credit had been extended at all within the meaning of § 523(a)(2), *see Id.* at 42–46, this Court cannot find that the *Mans* decision either speaks to the issue of whether, or can properly be cited for the proposition that, a creditor can satisfy the actual reliance/damage causation/inducement (i.e., "obtained by") element under § 523(a)(2)(A) and (B) without affirmatively proving such inducement by a preponderance of the evidence.[4]

---

4. In fact, it appears that the *Mans* court held that satisfaction by the creditor therein of the actual reliance/damage causation/inducement (i.e., "obtained by") element under § 523(a)(2) was no longer an issue. This

Court reads the *Mans* decision this way because (a) earlier decisions regarding such case had found the existence of an actionable affirmative fraud, *see Mans,* 157 F.3d at 44 n. 4, and (b) an earlier ruling regarding satisfac-

### E. *Did the Debtor make misrepresentations with fraudulent intent?*

■ Telmark argues that deceptive intent, as a matter of law, *can* be inferred from the making of a misrepresentation. *See* Telmark Pretrial Br. (Docket # 28), at p. 9. The Court quickly points out, however, that such statement of law does not mean that deceptive intent *must* be inferred from the making of a misrepresentation; instead, whether such inference is proper depends upon the facts in a particular case.

■ With respect to the instant matter, the Court cannot attribute to the Debtor an intent to deceive when the Debtor made the Schedule A Misrepresentations because, when such misrepresentations were made on April 9, 1999, the Debtor was well aware that he had already informed Telmark as to the dispositions of the Bale Wrapper and the Forage Chopper. Because the Debtor knew that Telmark was aware of such dispositions on April 9, 1999, the Court cannot find that the Debtor even harbored thoughts that he might have been able to, let alone actually intended to, deceive Telmark into believing that he still possessed the Bale Wrapper and the Forage Chopper. Furthermore, because the Debtor knew that Telmark had acquiesced in the Debtor's prior dispositions of the Bale Wrapper and the Forage Chopper, the Court fails to ascertain any reason why the Debtor would have thought he needed to, let alone actually intended to, deceive Telmark into believing that he still possessed such pieces of equipment. Moreover, the Court finds to be inconsistent with an intent to deceive by the Debtor that the Debtor (a) continued to make the lease payments which corresponded to the leases that pertained to the Bale Wrapper and the Forage Chopper,

(b) ultimately made all payments due under each such lease, and (c) ultimately paid the payoff figure at the end of the lease term for each such piece of equipment. The Court concludes that the foregoing serves quite comfortably to overcome any inference vis-a-vis the Debtor's intent that may be drawn simply from the Debtor's making of the Schedule A Misrepresentations. Furthermore, that the Debtor had the intent to, and did, convert interests of Telmark in the Bale Wrapper and Forage Chopper, *see infra* p. 215, neither means nor is even indicative of a finding that the Debtor also had the intent to thereby deceive Telmark. In light of the foregoing, and because Telmark has failed to produce any other evidence that bears on the issue of the Debtor's intent, the Court must conclude that Telmark has failed to preponderantly prove that the Debtor made the Schedule A Misrepresentations with fraudulent intent.

The Court must also conclude that, even if the Nondisclosures regarding the Debtor's disposition of the Bale Wrapper and the Forage Chopper constitute misrepresentations within the meaning of § 523(a)(2)(A), the Debtor lacked fraudulent intent with respect to such Nondisclosures. The Court concludes as it does primarily, although not solely, because (a) the only reason that the Court can discern as to why the Debtor would have intended to deceive Telmark with respect to such Nondisclosures is out of a fear on the Debtor's part that, as a consequence of informing Telmark, Telmark would have refrained from granting leases to the Debtor in the future and/or would have accelerated existing leases between the parties, (b) the Court finds, as set forth above, that the Debtor informed Telmark

---

tion of the actual reliance/damage causation/inducement (i.e., "obtained by") element

was not before the *Mans* court on appeal, *see Id.* at 39.

of the dispositions of the Bale Wrapper and the Forage Chopper (i) at least prior to Telmark's granting to the Debtor of the April 6, 1999 Lease, and (ii) in the face of the possibility that Telmark would accelerate existing leases upon receipt of such information, (c) such timing of the Debtor's conveyance of the aforesaid notice to Telmark is thus inconsistent with a finding that the Debtor possessed a fear that Telmark would, as a consequence of such notice, have taken adverse action against the Debtor, and (d) Telmark has thus failed to preponderantly demonstrate to the Court that the Debtor had a reason to, let alone intended to, deceive Telmark with respect to such Nondisclosures.

The Court must also conclude that, even if the Nondisclosures regarding the Debtor's disposition of the Corn Planter constitute misrepresentations within the meaning of § 523(a)(2)(A), the Debtor lacked fraudulent intent with respect to such Nondisclosures. Telmark appears to argue that, accepting that the Debtor notified Telmark of the dispositions of the Bale Wrapper and the Forage Chopper, such fraudulent intent is sufficiently demonstrated by virtue of the Debtor's lack of reason for his failure to provide similar notification to Telmark regarding disposition of the Corn Planter. *See* Telmark Pretrial Br. (Docket # 28), at p. 9. However, and of course, such position by Telmark fails if the Debtor, in fact, had a reason for failing to provide such similar notification regarding disposition of the Corn Planter. The Court identifies such a reason, which reason is implied by trial and deposition testimony of the Debtor, to wit that the Debtor, armed with knowledge that Telmark had conditionally approved or ratified the earlier dispositions of the Bale Wrapper and the Forage Chopper, proceeded under the premise that (a) disposition of the Corn Planter was likewise proper under the same conditions that Telmark

had placed upon the earlier dispositions, and (b) notification of such disposition was thus unnecessary. *See, e.g.,* Telmark Trial Ex. 11 (Booher Dep. Tr., at p. 8). Because said reason was advanced by the Debtor, and given that said reason is, the Court finds, as likely as not to have actuated the Debtor's failure to provide notice to Telmark regarding disposition of the Corn Planter, the Court must conclude that Telmark has failed to preponderantly prove that the Debtor lacked reason for, and consequently intended to deceive Telmark by, failing to so notify Telmark. Also supportive of the Court's conclusion is the Court's finding that an intent to deceive by the Debtor is inconsistent with the fact that the Debtor (a) continued to make the lease payments which corresponded to the lease that pertained to the Corn Planter, (b) ultimately made all payments due under such lease, and (c) ultimately paid the payoff figure at the end of the lease term for such piece of equipment. Finally, that the Debtor had the intent to, and did, convert interests of Telmark in the Corn Planter, *see infra* p. 215, neither means nor is even indicative of a finding that the Debtor also had the intent to thereby deceive Telmark.

**F. Do the Schedule A Misrepresentations and the Nondisclosures respect the Debtor's financial condition?**

 The Debtor, by virtue of the Schedule A Misrepresentations and—presuming only for the sake of argument that they constitute misrepresentations within the meaning of § 523(a)(2)(A)—the Nondisclosures, implicitly represented to Telmark that he possessed the 3 Pieces of Equipment on particular dates. An issue exists as to whether the content of such representations respects the Debtor's financial condition. If such representations

concern the Debtor's financial condition, then such representations are actionable only under § 523(a)(2)(B), *see* 11 U.S.C.A. § 523(a)(2)(A) & (a)(2)(B)(ii), which means, consequently, that Telmark's nondischargeability cause of action for fraud necessarily fails given that Telmark has proceeded with respect to such cause of action exclusively under § 523(a)(2)(A). Furthermore, the Nondisclosures, even if they constitute misrepresentations, would not be actionable if Telmark needed to proceed under § 523(a)(2)(B) with respect to the same given that (a) misrepresentations under § 523(a)(2)(B) must be in writing, *see* 11 U.S.C.A. § 523(a)(2)(B)(ii), and (b) the Nondisclosures obviously were not reduced to writing. Moreover, Telmark, in order to prevail under § 523(a)(2)(B), would need to demonstrate that its reliance upon the Schedule A Misrepresentations and the Nondisclosures was "reasonable" rather than "justifiable," *see* 11 U.S.C.A. § 523(a)(2)(B)(iii), which requisite showing cannot be made if, *inter alia*, a "minimal investigation [is not conducted and the same] would have uncovered the inaccuracies in the [D]ebtor's financial statement," *see* 4 *Collier on Bankruptcy*, ¶ 523.08[2][d] at 523–49. The Court concludes both that (a) a minimal investigation by Telmark would have revealed the inaccuracies in the Schedule A Misrepresentations and the Nondisclosures, and (b) Telmark has failed to preponderantly prove that it conducted such an investigation. Therefore, the Court concludes that Telmark's reliance upon the Schedule A Misrepresentations and the Nondisclosures was not reasonable and, accordingly, that such reliance was no better than justifiable, which reliance is insufficient for Telmark to prevail under § 523(a)(2)(B). Therefore, if the Schedule A Misrepresentations and the Nondisclosures concern the Debtor's financial condition, then, for several additional reasons as set forth above, Telmark's § 523(a)(2)(A) cause of action must fail.

Does the content of the Schedule A Misrepresentations and the Nondisclosures concern the Debtor's financial condition? Under a limited reading of the phrase "respecting the debtor's . . . financial condition," isolated statements regarding possession of particular pieces of personal property quite clearly would not constitute financial condition statements. *See In re Redburn*, 202 B.R. 917, 925 (Bankr. W.D.Mich.1996) (citing numerous cases where courts opt for a limited or strict interpretation of phrase); *In re Chivers*, 275 B.R. 606, 614–616 (Bankr.D.Utah 2002) (adopts strict interpretation). However, under an expansive reading of the phrase "respecting the debtor's . . . financial condition," such isolated statements would constitute financial condition statements. *See Redburn*, 202 B.R. at 925–926 (citing numerous cases where courts opt for an expansive interpretation of phrase); *In re Boice*, 149 B.R. 40, 46 (Bankr.S.D.N.Y. 1992) (adopts expansive interpretation and finds that a statement concerning the ownership of a home constitutes a financial condition statement). Further complicating the landscape are decisions like *Redburn*, wherein a "modified 'expansive' view" of the phrase "respecting the debtor's . . . financial condition" is taken. *See Redburn*, 202 B.R. at 926–929 (citing several cases as supportive of such reading). Under the "modified expansive view," an emphasis appears to be placed both upon (a) whether the statement in issue constitutes "information [that] a potential lender or investor would generally consider before investing," *Id.* at 928, and (b) "the intended purpose of . . . [such] statement," *Id.* The Third Circuit and the U.S. Supreme Court have yet to confront the issue of how to properly interpret the phrase "respecting the debtor's . . . financial condition."

Fortunately for the Court, because it has already determined upon several independent grounds that Telmark cannot prevail on its § 523(a)(2)(A) cause of action, the Court need not resolve (a) how to interpret and apply the phrase "respecting the debtor's ... financial condition," and (b) whether, under whatever such interpretation is ultimately applicable, the Schedule A Misrepresentations and the Nondisclosures concern the Debtor's financial condition.

### G. Ultimate Result of § 523(a)(2)(A) Analysis.

For all of the foregoing reasons, the Court holds that Telmark neither can nor does prevail on its § 523(a)(2)(A) cause of action. Accordingly, Telmark's claim against the Debtor cannot be excepted from discharge pursuant to § 523(a)(2)(A).

### II. Telmark's § 523(a)(4) Nondischargeability Cause of Action.

Telmark argues that its claim against the Debtor is, pursuant to § 523(a)(4), nondischargeable as a debt for embezzlement.

Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come. It differs from larceny in the fact that the original taking of the property was lawful, or with the consent of the owner, while in larceny the felonious intent must have existed at the time of the taking. The required elements of embezzlement are: (1) appropriation of funds for the debtor's own benefit by fraudulent intent or deceit; (2) the deposit of the resulting funds in an account accessible only to the debtor; and (3) the disbursal or use of those funds without explanation of reason or purpose.

4 *Collier on Bankruptcy*, ¶ 523.10[2] at 523–76. The Court can only presume that Telmark, by so proceeding under § 523(a)(4) and thus necessarily asserting that the Debtor has engaged in embezzlement, contends that the Debtor embezzled the proceeds which the Debtor obtained upon the Debtor's disposition of the 3 Pieces of the Equipment. For several reasons set forth below, the Court holds that Telmark cannot prevail on its § 523(a)(4) cause of action.

First, embezzlement requires, *inter alia*, a fraudulent appropriation by a debtor of funds for his own benefit. Unfortunately for Telmark, however, the Court has already concluded, within its § 523(a)(2)(A) analysis above, that the Debtor lacked fraudulent intent when he failed to notify Telmark that he had, or when he implicitly represented to Telmark that he had not, disposed of the 3 Pieces of Equipment. The Court now likewise concludes that the Debtor lacked fraudulent intent when he retained and/or used for his own benefit the proceeds which he obtained from his dispositions of the 3 Pieces of the Equipment.

Second, embezzlement requires that a debtor have used the funds in question without explanation. Unfortunately for Telmark, however, the Court has already found, within its § 523(a)(2)(A) analysis above, that, with respect to the Bale Wrapper and the Forage Chopper, the Debtor notified Telmark of, and Telmark subsequently ratified, dispositions of such equipment. The Court finds it to be inconceivable that Telmark would not, upon learning of such dispositions, have then inquired and ascertained what the Debtor ultimately did with the proceeds that emanated from such dispositions. Accordingly, such ratification leads the Court to necessarily conclude that Telmark was also provided with an explanation by the Debtor regarding the use to which he put the proceeds which emanated from his disposition of the

Bale Wrapper and the Forage Chopper, which explanation thwarts Telmark's attempt to except from discharge via § 523(a)(4) any claim against the Debtor which is tied to the Debtor's retention and/or use of such proceeds.

Third, Telmark can except from discharge via the "embezzlement" prong of § 523(a)(4) only those claims that Telmark would have against the Debtor for embezzlement. *See* 11 U.S.C.A. § 523(a)(4) (West 1993) (§ 523(a)(4) does not operate to except from discharge debts of a debtor generally on the ground that he or she has embezzled; rather, the plain language of § 523(a)(4) excepts from discharge only "any *debt* . . . for . . . [such] embezzlement"); 4 *Collier on Bankruptcy*, ¶ 523.10[2] at 523–76 ("any *debt resulting from* embezzlement . . . falls within the exception of clause (4)" of § 523(a)). What this ultimately means, *inter alia*, is that Telmark can so except from discharge only a claim for those damages that Telmark could recover for such embezzlement, which damages, without even considering the lack of merit that the Court attributes to Telmark's embezzlement argument, are limited, at least in the present case, to the amount of the proceeds which the Debtor obtained from his dispositions of the 3 Pieces of Equipment. The Court finds that such damages are limited to the amount of such proceeds and nothing more because, even accepting an anticipated argument by Telmark to the effect that the Debtor's aforesaid dispositions served to destroy Telmark's alleged future security interests in the 3 Pieces of Equipment, such destruction did not follow from, and thus cannot be remedied by a cause of action for, the Debtor's alleged embezzlement. Because the parties agree that the Debtor obtained $35,500 in return for his dispositions of the 3 Pieces of Equipment, only a claim for such sum could be except-ed from discharge under § 523(a)(4) on the ground that it constitutes a debt for embezzlement. Of course, a claim for $35,500 is a far cry from the $231,741.66 claim that Telmark seeks to have declared nondischargeable. Moreover, even if an embezzlement occurred as Telmark alleges, Telmark was not damaged at all, let alone to the tune of $35,500, with respect to such embezzlement given that (a) the Debtor continued to make the lease payments which corresponded to the lease that pertained to each of the 3 Pieces of Equipment, (b) the Debtor ultimately made all payments due under each such lease, (c) the Debtor ultimately paid the payoff figure at the end of the lease term for each such piece of equipment, and (d) Telmark thus received full compensation for the 3 Pieces of Equipment, which compensation subsumes, *inter alia*, an amount equal to the aforesaid $35,500 in proceeds.

Finally, but perhaps most significantly, the Court holds that, even without considering the lack of merit that the Court attributes to Telmark's embezzlement argument, Telmark cannot except from discharge via the "embezzlement" prong of § 523(a)(4) even $35,500 of its claim against the Debtor. The Court holds as it does because such claim of Telmark, which claim is the only one that Telmark seeks to except from discharge via its adversary complaint, is not one for damages from embezzlement but is, instead, a claim that is decidedly one for breach of contract, which conclusion is compelled by the observation that Telmark so obviously predicates its right to recovery and calculation of damages vis-a-vis its claim on breached provisions in both the lease agreements between the parties and the Cross–Collateralization Agreement. Because Telmark has sought to except from discharge only the breach of contract claim that it has against the Debtor, and

since such claim cannot be viewed as one for embezzlement notwithstanding the potential existence of such a separate claim in favor of Telmark, and given that only claims for embezzlement can be excepted from discharge via the "embezzlement" prong of § 523(a)(4), *see supra* p. 214, no part of Telmark's breach of contract claim can be excepted from discharge via the "embezzlement" prong of § 523(a)(4).

In light of the foregoing, the Court holds that Telmark neither can nor does prevail on its § 523(a)(4) cause of action. Accordingly, Telmark's claim against the Debtor cannot be excepted from discharge pursuant to § 523(a)(4).

### III. *Telmark's § 523(a)(6) Nondischargeability Cause of Action.*

Telmark argues finally that its claim is nondischargeable under § 523(a)(6) as a debt for willful and malicious injury to property of Telmark. In support of its § 523(a)(6) cause of action, Telmark argues that the Debtor, by disposing of the 3 Pieces of Equipment, converted and, thereby, willfully and maliciously injured both Telmark's ownership interest in such property and Telmark's subsequently-acquired security interest in such property.

■ As an initial matter, the Court concludes, and without any doubt, that the Debtor converted Telmark's ownership interest in the 3 Pieces of Equipment when the Debtor disposed of such equipment. The Court is constrained to conclude as it does given that, at the time of the disposition of each such piece of equipment, title to such equipment rested with Telmark, who was then merely leasing such property to the Debtor. The Court will also accept, at least for purposes of the instant opinion, Telmark's position that the Debtor, by virtue of the aforesaid dispositions, converted Telmark's subsequently-acquired security interests in the 3 Pieces of

Equipment. Furthermore, the Court agrees with Telmark that, at least in general, a claim for tortious conversion is nondischargeable pursuant to § 523(a)(6).

■ Having arrived at the preceding conclusions, however, the Court is not thereby compelled to conclude that Telmark's breach of contract claim, which claim constitutes the only one for which Telmark seeks a determination of nondischargeability, is nondischargeable pursuant to § 523(a)(6). In fact, for several reasons set forth below, the Court holds that Telmark cannot prevail on its § 523(a)(6) cause of action. Crucial to the Court's reasoning below is the Court's holding that Telmark can except from discharge pursuant to § 523(a)(6) only those claims that Telmark would have against the Debtor for willful and malicious injury to Telmark's property. *See* 11 U.S.C.A. § 523(a)(6) (West 1993) (§ 523(a)(6) does not operate to except from discharge debts of a debtor generally on the ground that he or she has willfully and maliciously harmed property interests; rather, the plain language of § 523(a)(6) excepts from discharge only "any *debt* ... for ... [such] willful and malicious injury").

■ First, the Court concludes that Telmark lacks a meritorious claim against the Debtor for tortious conversion of, and thus willful and malicious injury to, Telmark's ownership interest in the 3 Pieces of Equipment given that Telmark cannot even demonstrate that it has suffered any damages as a result of such conversion. "Generally[,] the measure of damages [in a successful action for conversion] is the value of the goods at the time and place of the conversion." 37 P.L.E. *Trespass* § 111 at 473 (West 1961). Because neither party has introduced evidence as to the value of the 3 Pieces of Equipment on the date that each was disposed of save for

the amount of the consideration—$35,500 in total—that the Debtor received in return for such dispositions, the Court shall hold that (a) such equipment had a collective value of $35,500 on the dates that it was disposed of by the Debtor, and (b) Telmark could not recover more than $35,500 in an action for conversion of its ownership interest in such equipment. Unfortunately for Telmark, and as Telmark concedes via stipulation, the Debtor, despite his disposal of the 3 Pieces of Equipment, (a) continued to make the lease payments which corresponded to the lease that pertained to each disposed piece of equipment, (b) ultimately made all payments due under each such lease, and (c) ultimately paid the payoff figure at the end of the lease term for each disposed piece of equipment. As a result of such payments by the Debtor, Telmark has already been more than compensated for its loss of ownership interest in the 3 Pieces of Equipment, thereby (a) barring it from further recovery for such loss by way of an action for conversion, and (b) foreclosing any argument by Telmark that it has a claim against the Debtor for willful and malicious injury to such ownership interest.

Second, the Court concludes that Telmark lacks a meritorious claim against the Debtor for tortious conversion of, and thus willful and malicious injury to, Telmark's subsequently-acquired security interests in the Bale Wrapper and the Forage Chopper. The Court concludes as it does because (a) ratification constitutes a successful defense to a claim of conversion, see 37 P.L.E. *Trespass* § 106 at 457, and (b) Telmark, as the Court has already found, conditionally approved the Debtor's dispositions of these two particular pieces of equipment, which approval, the Court concludes, constituted a ratification of the Debtor's conversion of both Telmark's ownership interest and subsequently-acquired security interests in such equipment. Because of such ratification by Telmark of the Debtor's conversion of Telmark's subsequently-acquired security interests in the Bale Wrapper and the Forage Chopper, Telmark is foreclosed from arguing that it has a claim against the Debtor for willful and malicious injury to such security interests.

Third, the Court concludes that a claim of Telmark against the Debtor for tortious conversion of, and thus willful and malicious injury to, Telmark's subsequently-acquired security interest in the Corn Planter is limited to damages in the amount of $1,500. The Court concludes as it does because (a) the value of a security interest can fluctuate over time, (b) "[i]n the case of the conversion of 'property of fluctuating value, the damages are limited to the difference between the proceeds of the conversion, or that portion thereof duly paid or credited to the owner, and such higher value as the property may have reached within a reasonable time after the owner had notice of the conversion,'" 37 P.L.E. *Trespass* § 111 at 474, (c) the Debtor received proceeds of $1,500 in return for his disposition of the Corn Planter, none of which he then paid over or credited to Telmark, (d) the Court concludes, in turn, that the value of the Corn Planter would not have increased from $1,500 between the date of its conversion and a reasonable time after Telmark had notice of such conversion given that such piece of equipment was severely damaged due to accident, and (e) the maximum amount of injury that Telmark could have thus experienced with respect to its subsequently-acquired security interest in the Corn Planter equals $1,500. The Court concludes, in light of the instant paragraph and the two that precede it, that $1,500 is the maximum amount of any claim that Telmark could except from discharge under § 523(a)(6) on the ground that such

claim constitutes a debt for willful and malicious injury to the asserted property interests of Telmark. A claim for $1,500 is, to say the least, a far cry from the $231,741.66 claim that Telmark seeks to have declared nondischargeable.

■ Finally, and as is the case with respect to Telmark's § 523(a)(4) cause of action, the Court holds that, even without considering the lack of merit that the Court attributes to practically all of Telmark's § 523(a)(6) cause of action, Telmark cannot except from discharge via § 523(a)(6) even $1,500 of its claim against the Debtor. The Court holds as it does because such claim of Telmark, which claim is the only one that Telmark seeks to except from discharge via its adversary complaint, is one for breach of contract rather than one for injury to a property interest. *See supra* pp. 214–15. Because Telmark has sought to except from discharge only the breach of contract claim that it has against the Debtor, and since such claim cannot be viewed as one for willful and malicious injury to a property interest of Telmark notwithstanding the potential existence of such a separate claim in favor of Telmark, *see* 4 *Collier on Bankruptcy*, ¶ 523.12 at 523–90 ("Section 523(a)(6) generally relates to torts and not to contracts"), and given that only claims for such willful and malicious injury can be excepted from discharge pursuant to § 523(a)(6), *see supra* p. 215, no part of such breach of contract claim can be excepted from discharge pursuant to § 523(a)(6).

In light of the foregoing, the Court holds that Telmark neither can nor does prevail on its § 523(a)(6) cause of action. Accordingly, Telmark's claim against the Debtor cannot be excepted from discharge pursuant to § 523(a)(6).

### CONCLUSION

For all of the foregoing reasons, Telmark's claim cannot be excepted from the Debtor's Chapter 7 discharge under either 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), or 523(a)(6). Judgment in the instant adversary proceeding (Adv. No. 01–2056–MBM) is thus entered in favor of the Debtor, and Telmark's claim is accordingly discharged in its entirety. Because Telmark's claim is discharged in its entirety, and since the instant bankruptcy case is now a no-asset Chapter 7 case after its prior conversions from Chapters 11 and 12, the Court has no need to liquidate such claim. Therefore, the Debtor's objection to Telmark's claim (Mot. No. 01–7313M) shall be dismissed as moot.

An appropriate order will be entered.

### ORDER OF COURT

**AND NOW,** this **17th day of October, 2002,** upon consideration of (a) the adversary complaint of Telmark, LLC (hereafter "Telmark") (Adv. No. 01–2056–MBM), wherein Telmark seeks a determination that its claim against Todd Booher, the above-captioned debtor (hereafter "the Debtor"), is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6), (b) the Debtor's objection to Telmark's claim (Mot. No. 01–7313M), as well as the Debtor's position that, if such objection is sustained and such claim is disallowed in its entirety, then the nondischargeability adversary proceeding becomes moot, and (c) Telmark's trial exhibits; and subsequent to notice and a trial on the matters held on September 18, 2002; and for the reasons set forth in the accompanying Memorandum Opinion dated October 17, 2002, it is hereby **ORDERED, ADJUDGED, AND DECREED** that:

(a) Telmark's claim is **not excepted** from the Debtor's Chapter 7 dis-

charge under either 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), or 523(a)(6), **JUDGMENT** in the instant adversary proceeding is thus **entered in favor of the Debtor,** and Telmark's claim is accordingly **DISCHARGED** in its entirety, and

(b) the Debtor's objection to Telmark's claim is **DISMISSED as moot** given that (i) the instant bankruptcy case is now a no-asset Chapter 7 case after its prior conversion from Chapters 11 and 12, and (ii) Telmark's claim is discharged in its entirety.